OPINION OF THE COURT
Renee R. Roth, S.
At issue in this contested proceeding is whether the private placement adoption of "Baby Girl S.” can be granted without the consent of her unwed father.
The prospective adoptive parents (Jane and Ed) contend that the consent of the father (Gustavo) is not necessary because he does not meet the criteria of Domestic Relations Law § 111 (1) (e). Gustavo, on the other hand, claims that the adoption proceeding must be dismissed because (1) this court lacked jurisdiction to entertain the proceeding since there were pending in the Family Court, Suffolk County, consolidated proceedings to determine his paternity and his right to custody of the infant and (2) Jane and Ed, both practicing attorneys, committed a fraud upon this court by failing to disclose Gustavo’s identity as the father of the infant in their petition to adopt her. In the alternative, Gustavo asks the court to find that Domestic Relations Law § 111 (1) (e) is unconstitutional to the extent that it purports to deprive him of his rights as a parent.
The background relevant to this decision follows.
On May 4, 1988, Jane and Ed commenced a proceeding in this court to adopt Baby Girl S., born April 24, 1988. Included among the papers filed with the court were the extrajudicial consents of the natural mother (Regina) and her estranged husband (Mr. S.).
On May 18, 1988, Regina appeared before this court to place on the record her irrevocable consent to the adoption of her daughter. When asked to identify the father of her child, Regina replied: "My husband at the time”. She further stated in her testimony and in her extrajudicial consent that she placed her daughter with Jane and Ed after she answered a *907 "personal newspaper ad placed by petitioners [Jane and Ed] in the Long Island Sound”.
Less than a month later, on June 15, 1988, this court was informed that a proceeding to establish Gustavo’s paternity of Regina’s unborn child had been pending in the Family Court, Suffolk County, since March 1988.
The proceedings in the Family Court follow.
On March 2, 1988 (53 days before the birth of Baby Girl S.), Gustavo filed a petition to establish his paternity and obtain custody of his and Regina’s unborn child. Process issued by the court (Family Ct Act § 524), returnable on April 13, was adjourned to May 13 because its service on Regina was claimed by her counsel to be improper. On May 6, Regina was served again with an order to show cause that restrained her "from removing or causing the removal of said child from Suffolk County”.
Counsel for Regina and Gustavo next appeared in the Family Court on May 13. Regina’s lawyer omitted to advise Judge Simon that she had given birth on April 24 or that the infant had been placed for adoption in New York County. Judge Simon continued his prior restraining order and adjourned the matter to June 9 (during this period, Regina appeared in this court to place her consent to the adoption on the record). On June 9, counsel appeared again in the Family Court. Judge Simon and Gustavo were then finally told that Regina had given birth. The Judge directed Regina to appear with the baby on June 14, on which date she disclosed that she had surrendered the baby for adoption. On the same day, Gustavo filed with the Putative Father Registry and the following day Gustavo’s attorney informed this court about the paternity and custody proceedings.
This court thereupon appointed a guardian ad litem, Kevin C. Fogarty, to represent Baby Girl S. and a trial on the issue of paternity was scheduled for July 18, 1988. On the morning of trial, Regina by new counsel submitted an affidavit in which she stated her "wish to correct the testimony that I gave before Surrogate Roth on May 18, 1988” with respect to the identification of her husband as the father of Baby Girl S. She also stated that the attorney for Jane and Ed, David H. Verplank, advised her to give the "mistaken” responses she gave in her testimony.
Based upon the overwhelming proof, Gustavo was determined to be the father of Baby Girl S. (Matter of Baby Girl S., *908 140 Misc 2d 299) and a hearing was scheduled to determine his rights in the adoption proceeding. When court convened for this trial, Regina’s counsel announced that her client wished to revoke her consent to the adoption and to either take custody of Baby Girl S. or give custody to Gustavo. Regina’s counsel stated that she could no longer represent Regina because her fee was being paid by Jane and Ed. Counsel from the 18-B panel (County Law art 18-B) were appointed for Regina and the trial finally commenced on September 29, 1988. All the parties testified.
Regina corroborated the testimony Gustavo had given at the paternity hearing. When Regina told Gustavo in late August 1987 that she had missed her menstrual period, he said: "I love you and want to marry you”. Regina answered: "You are going too fast; we need more time and more money and have to get to know each other”. Regina was also concerned that her pregnancy would create problems in her divorce proceeding and might cause her to lose custody of her nine-year-old son.
Regina confirmed that she thereafter told Gustavo that she was not pregnant and terminated their relationship. In early October, Regina consulted David H. Verplank, an attorney. Verplank told her that he knew of a professional couple who had already adopted a boy who was part Hispanic. He subsequently gave her Jane and Ed’s unlisted telephone number.
Regina and Jane spoke for the first time on December 2, 1987. The manner in which the parties learned about each other is significant. Although Regina testified at her consent hearing on May 18, 1988 that she learned about Jane and Ed from an advertisement in the Long Island Sound, she stated at this trial that on her way to court on May 18 Verplank advised her: "If the Judge asks you how you learned about Jane and Ed, just say you saw an ad in the Long Island Sound because I’m not supposed to be the go between” (see, Social Services Law § 374 [2], [6]; § 389 [2]).
During his testimony, Ed said that in early November he and Jane had installed an unlisted telephone number and included it in an advertisement stating their desire to adopt an infant which appeared in the Suffolk Life Newspapers on November 18 and 25. Ed testified that he discussed with Verplank the installation of a private number and the advertisement but invoked the attorney-client privilege when asked for details of the discussion.
*909 Gustavo was informed of Regina’s pregnancy in early January 1988 in a telephone call from a friend. He thereupon called Regina who confirmed her pregnancy but insisted he was not the father. During their conversation, she said that she was going to give the baby up for adoption but Gustavo begged her not to and said he wanted the child. Gustavo thereafter went to see Regina in person. He told her that he loved her and that he had $8,000 to help pay for her expenses. Regina said she screamed at him that the baby wasn’t his.
On January 29, Gustavo retained an attorney who filed the Family Court applications on March 2, 1988. Regina was served by mail with a summons and verified petition (the paternity papers) about April 10. She immediately called Verplank who instructed her to bring the papers to his office. Shortly thereafter, Regina spoke to Jane about the paternity papers. Regina testified: "I read the papers to her” and "discussed each allegation”. Jane, on the other hand, alleges that Regina said: "I received papers — they’re all lies” and became hysterical. Jane said she advised Regina: "Get them to your lawyer right away”. On cross-examination, Jane admitted that Regina had said she had received "legal papers from Gus” and had read to her some of the allegations. She further stated that Regina said: "I have to go into court in two days (Apr. 13), I can’t go into court — my doctor won’t let me”. Regina also testified that during a subsequent conversation with Jane, she also spoke to Ed and asked what he thought about "the latest Gus issue”. According to her, Ed replied: "I’m not too concerned; with three lawyers working on it I’m sure we can mastermind something”. Ed denies this conversation.
On April 27, three days after she had given birth to Baby Girl S., Regina received from Verplank the form to consent to the adoption of her daughter. Verplank told her to use her maiden name when she signed her consent so that Gustavo would be prevented from finding out about the adoption if he filed with the Putative Father Registry. Subsequently, Verplank told Regina that she was required to appear in this court on May 18, 1988 to consent to the adoption, that he had arranged to have an attorney represent her at that hearing and that she should not tell the attorney anything about Gustavo or the paternity proceeding.
We turn now to the testimony of Jane and Ed, the prospective adoptive parents.
*910 Ed testified that Jane told him in early April that Regina had received legal papers from Gus. Ed said that he had discussed these papers with Verplank a few days later but invoked the attorney-client privilege when asked for the details of their conversation.
Jane testified that "Regina told me Gus was the father”. She claimed the attorney-client privilege when asked what Verplank told her. Jane said that after Regina told her about Gustavo’s January 27 visit, she wanted to find out about the rights of out-of-wedlock fathers. A partner in the major firm in which she was employed suggested that she meet with former Surrogate Millard L. Midonick. Jane testified that the former Surrogate told her that under Domestic Relations Law § 111 (1) (e) Gustavo’s consent was not required and that he would not be entitled to notice unless he had filed with the Putative Father Registry. Jane did not relate the particular facts she gave to former Judge Midonick or what he actually advised. Ed and Jane did not call former Judge Midonick as a witness.
Jane asserts that all of her actions thereafter were predicated upon the advice she was given at this meeting. She admitted, however, that she had not informed the former Surrogate that Gustavo had served "legal papers” on Regina.
The adoption petition verified by Jane and Ed on April 26, 1988 (two days after the birth of the baby) contains two relevant paragraphs: paragraph 7 (b) states: "The consent of the father of the adoptive child is submitted herewith” (the consent of Regina’s estranged husband) and paragraph 10 states: "To the best of petitioners’ information and belief, there are no persons other than those hereinbefore mentioned interested in this proceeding”.
Jane and Ed were asked whether they filed this verified petition in the expectation that the court would rely on it. They each responded affirmatively. They were then asked: "Was what you swore to about the father in the petition a full and fair statement of the situation as it was?” Both responded that former Judge Midonick had said that Gustavo had to satisfy the criteria of Domestic Relations Law § 111 (1) (e). They were then asked whether that was a determination to be made by them or the court. They both answered: "The court”. When asked how the court could render such a decision without being informed that the issue existed, they had no adequate response.
*911 Even if Jane and Ed’s alleged good-faith reliance upon the "advice” of former Judge Midonick were to be given credence it is vitiated by their false statement in paragraph 7 (b). They knew very well that Gustavo was the father of Regina’s child and not her estranged husband whose consent they submitted.
Equally troublesome to the court is petitioners’ assertion that when Jane learned that Regina had received "legal papers from Gus”, neither of them made any effort to question Regina about the nature of these papers or their contents. Even if Jane and Ed were laymen, this contention would be hard to believe. For two lawyers, it is totally disingenuous.
Moreover, Regina testified that she brought the paternity papers to Verplank, petitioners’ attorney. Relying on their attorney-client privilege, petitioners refused to answer any questions with respect to information they received from Verplank regarding these papers.
It is very clear that before Baby Girl S. was born, Jane and Ed knew the nature of the proceedings commenced by Gustavo and that they were less than candid in their verified petition filed in this court.
In her concluding testimony, Regina commented: "We hoped he [Gustavo] would not get wind of the whole scheme”. This statement is a fair summary of the record.
It is apparent that Jane, Ed and Verplank orchestrated this proceeding so that this court would not discover their omission of Gustavo from the adoption petition. Moreover, the filing of the adoption petition was a blatant attempt to make an end run around the Family Court proceedings. If the true facts had been disclosed to this court, either the petition would not have been accepted or it would have been held in abeyance until a determination was made by Judge Simon. Equally important is the fact that petitioners would not have been parties to the Suffolk County custody proceeding which involved only the parents of the child. In this adoption proceeding, because Regina gave her daughter to petitioners, they are parties.
Finally, it is observed that almost two weeks before Regina placed on the record her consent to the adoption of her daughter, she had been restrained from removing the child from Suffolk County. Since he had not been informed that Regina had already given birth and placed her child for adoption, this restraint was intended by Judge Simon to *912 maintain the status quo. Clearly, when Regina gave her consent before this court, she violated Judge Simon’s order.
The record establishes that this proceeding is permeated with fraud and misrepresentation. Each of the parties, with the exception of Gustavo, had an agenda not revealed in the papers and abused the judicial process to achieve it. Their behavior was no better in the Family Court where they deliberately suppressed material facts. The court cannot sanction such misuse of the judicial system by litigants, particularly when some of them are practicing attorneys.
Although it is concluded that this proceeding must be dismissed because of fraud and misrepresentation (see, Domestic Relations Law § 114; Matter of Lord, 28 AD2d 1203; Matter of Natural Parents of Nicky v Dumpson, 81 Misc 2d 132), the court will address petitioners’ contention that Gustavo is precluded from opposing the adoption by Domestic Relations Law § 111 (1) (e).
Such statute can best be understood in the context of the historical development of the rights of unwed fathers. Until the beginning of the last decade (see, e.g., Stanley v Illinois, 405 US 645), the rights of unwed fathers were virtually ignored. But in this era of dramatic change in family law, courts have begun to consider the constitutionality of laws denying parental rights to unwed fathers (see, In re Baby Girl Eason, 257 Ga 292, 358 SE2d 459 [1987]; In re Adoption of Baby Boy Doe, 717 P2d 686 [Utah 1986]; Ellis v Social Servs. Dept. of Church of Jesus Christ of Latter Day Saints, 615 P2d 1250 [Utah 1980]; In re Riggs v Riggs, 612 SW2d 461 [Tenn App 1980]; Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v Robertson, 45 Ohio State LJ 313 [1984]; Comment, Caban v Mohammed: Extending the Rights of Unwed Fathers, 46 Brooklyn L Rev 95 [1979]; Note Adoption: The Rights of the Putative Father, 37 Okla L Rev 583 [1984]; Clark, The Law of Domestic Relations in the United States § 20, at 850-868 [1987]).
Two double standards, however, still prevail in the law: unwed mothers have more rights than unwed fathers and married fathers have more rights than unmarried fathers. In California, an unwed father is not even entitled to a hearing to establish his paternity (prompting a case that will soon be heard by the United States Supreme Court) but Wisconsin recently passed a precedent-setting law that permits an unwed father to assume parental rights for his children if he signs an affidavit of paternity.
*913 In New York, prior to 1972, an unwed father had no right to be heard on the adoption of his child. By 1978, such fathers had a limited right to receive notice of adoption proceedings but could be heard only on the issue of the best interests of their children (Stanley v Illinois, supra; Quilloin v Walcott, 434 US 246; Matter of Gerald G. G., 61 AD2d 521; Domestic Relations Law § 111-a [added L 1976, ch 665], as amended by L 1977, ch 862).
In 1979, Domestic Relations Law § 111 (the predecessor to the current statute) was declared unconstitutional by the United States Supreme Court (Caban v Mohammed, 441 US 380) because it provided that a nonmarital father’s consent to an adoption of his child was not required, regardless of his relationship with the child, while the mother’s consent was required. The Supreme Court held that such an "undifferentiated distinction between unwed mothers and unwed fathers, applicable in all circumstances where adoption of a child of theirs is at issue, does not bear a substantial relationship to the State’s asserted interest.” (Supra, at 394.)
As a result of Caban (supra), Domestic Relations Law §§ 111 and also 111-a were amended (L 1980, ch 575, eff July 26, 1980). Because Caban recognized the right of a State, in some but not all circumstances, to deny an unwed father the right to veto an adoption where he failed to be a concerned parent, the Legislature provided specific criteria to assist our courts in determining when such a father has sufficiently fulfilled his parental obligations.
The new Domestic Relations Law § 111 describes the two circumstances under which the consent of an out-of-wedlock father to the adoption of his child is required. Subdivision (1) (d) of such statute applies to a child placed more than six months after birth. This subdivision does not apply to the placement of Baby Girl S. since she was placed with petitioners at birth. Subdivision (1) (e) applies to "a child born out-of-wedlock who is under the age of six months at the time he is placed for adoption”. This provision requires the father’s consent only if: "(i) such father openly lived with the child or the child’s mother for a continuous period of six months immediately preceding the placement of the child for adoption; and (ii) such father openly held himself out to be the father of such child during such period; and (iii) such father paid a fair and reasonable sum, in accordance with his means, for the medical, hospital and nursing expenses incurred in *914 connection with the mother’s pregnancy or with the birth of the child.”
The threshold question is whether Gustavo sufficiently fulfilled the requirements of the above-quoted statute.
It is clear that by commencing paternity and custody proceedings Gustavo held himself out to be the father of Baby Girl S. Moreover, by seeking a declaration of his paternity of Regina’s unborn child, Gustavo obligated himself to support his child (Family Ct Act §§ 513, 545) and became obligated to pay the necessary expenses in connection with her birth (Family Ct Act §§514, 545). Thus, by commencing these proceedings and offering support, Gustavo satisfied 2 of the 3 criteria listed in Domestic Relations Law § 111 (1) (e).
Gustavo did not live with Regina or Baby Girl S. for "a * * * period of six months immediately preceding the placement of the child”. (Domestic Relations Law § 111 [1] [e] [i].) He obviously could not have lived with the child for any such period since she was placed with petitioners by Regina at birth without Gustavo’s knowledge that she had been born. Regina testified that she hid her pregnancy from Gustavo and when he learned that she was pregnant, she denied his paternity. The record establishes that Gustavo’s proposal of marriage, offers of support and request for custody of the child were all declined.
Because, without fault on his part, he was prevented by Regina from fulfilling the requirement that he live with the child or Regina for a continuous period of six months, Gustavo contends that section 111 (1) (e) imposes an unreasonable and irrational condition and violates the parental rights afforded him by Stanley v Illinois (405 US 645, supra) and Caban v Mohammed (441 US 380, supra).
In construing a statute of this State, the court is required to seek a construction that does not raise a constitutional question. Our courts are not a substitute for the Legislature and may only as a last resort strike down a solemn legislative enactment on the ground that it conflicts with the Federal or State Constitution. However, "where the consequences may be severe and the damage irreparable, the lower court should not hesitate to determine the constitutionality of a statute” (McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [a]).
This court therefore must determine initially whether the statute in question requires literal compliance or whether its objective was to require that an unwed father demonstrate his interest in his child by some established standards.
*915 In his memorandum in support of the bill which ultimately became Domestic Relations Law § 111 (1) (d) and (e), its sponsor, Senator Joseph R. Pisani, explained that the proposed law follows "the Supreme Court’s opinion [in Caban (supra)] which accords protection to fathers who 'participated in the rearing’ of the child, who had 'established a substantial relationship with the child’, or who have 'manifested a significant parental interest in the child’. This bill”, he added, "provides a reasonable, unambiguous and objective standard to guide agencies and courts” (1980 NY Legis Ann, at 243 [emphasis added]).
It is informative to observe the requirements of subdivision (1) (d) of section 111, which mandate the consent of the unwed father of a child placed with adoptive parents "more than six months after birth”. Under that subdivision, consent is required: "if such father shall have maintained substantial and continuous or repeated contact with the child as manifested by: (i) the payment by the father toward the support of the child * * * and either (ii) the father’s visiting the child * * * and not prevented from doing so by the person * * * having lawful custody of the child, or (iii) the father’s regular communication with the child * * * when physically and financially unable to visit the child or prevented from doing so by the person * * * having lawful custody of the child” (emphasis added).
The underscored language present in subdivision (1) (d) is not present in subdivision (1) (e). Its omission is not significant. That language in subdivision (1) (d) was intended to preserve the rights of a father who was prevented from visiting or communicating with his child after birth. Since the criteria in subdivision (1) (e) do not mention visitation or communication with the child, no parallel exoneration provision was necessary. Such a "savings clause” can and should be read into subdivision (1) (e) to safeguard the constitutional rights of an unwed father who has manifested a significant continuous interest in his child but was prevented from implementing it.
Certainly, Gustavo did everything possible to persuade Regina to marry or live with him and to accept his offer of financial assistance. Because he was a concerned father, Gustavo sought to enforce his rights and responsibilities in the Family Court before his child was born, filed with the Putative Father Registry upon learning of her birth and moved *916 immediately to intervene when he was told that an adoption proceeding was pending in this court. He obviously did all he could have done under the circumstances. In Lehr v Robertson (463 US 248, 263) (discussed below) Justice Stevens, for the majority, observed that: "[t]he most effective protection of the putative father’s opportunity to develop a relationship with his child is provided by the laws that authorize formal marriage and govern its consequences. But the availability of that protection is, of course, dependent on the will of both parents of the child. Thus, New York had adopted a special statutory scheme to protect the unmarried father’s interest in assuming a responsible role in the future of his child.” (Emphasis added.)
Literal compliance with the first test in subdivision (1) (e) (living with the mother) also depends upon the will of both parents. Gustavo cannot meet this test because he was prevented from doing so by Regina.
In drafting Domestic Relations Law § 111 (1) (d) and (e), the Legislature was concerned with balancing two competing interests: the right of a State to provide for the adoption of nonmarital children and the right of an unwed father to enjoy a parent-child relationship.
It is clear that in adding subdivision (1) (d) and (e) to section 111, the Legislature intended to abolish the existing unconstitutional statutory discrimination against unwed fathers vis-ávis unwed mothers but only when the unwed father has demonstrated his desire for a caring and ongoing relationship with his child. A requirement that the unwed father openly live with the child for a continuous period of six months is a reasonable requirement. But compliance with such a condition depends upon the will of the mother as well as of the father. The constitutional right of the unwed father who has demonstrated responsibility for his child cannot be made to depend upon a condition outside his control. The statute was not intended to exclude from the class of unwed fathers whose consent to the adoption of their children is required, a father who was able and willing to comply with a statutory condition but was prevented from doing so by an unwilling mother. As so construed, the court finds that Gustavo satisfied the conditions of subdivision (1) (e) of section 111 in a meaningful way and that accordingly his refusal to consent to the adoption of his daughter requires the dismissal of the petition seeking her adoption.
*917 Any other interpretation of the statute would require this court to hold the statute unconstitutional under Caban’s standards. As Mr. Justice Powell observed (441 US 380, 394, supra): "The effect of New York’s classification is to discriminate against unwed fathers even when their identity is known and they have manifested a significant paternal interest in the child. The facts of this case illustrate the harshness of classifying unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned judgment as to the fate of their children. Section 111 both excludes some loving fathers from full participation in the decision whether their children will be adopted and, at the same time, enables some alienated mothers arbitrarily to cut off the paternal rights of fathers. We conclude that this undifferentiated distinction between unwed mothers and unwed fathers, applicable in all circumstances where adoption of a child of theirs is at issue, does not bear a substantial relationship to the State’s asserted interests” (emphasis added).
Gustavo’s concern for his child is, at the very least, as substantial and significant as Mr. Caban’s concern for his children.
There has been no adjudication by the United States Supreme Court or by the appellate courts of this State as to the constitutionality of subdivision (1) (e) of Domestic Relations Law § 111 as applied to a father who has behaved as Gustavo did. Although two memoranda decisions by the Second Department (Matter of "Female" D., 83 AD2d 933; Matter of Michael Patrick C., 83 AD2d 932) have ruled that the statute is constitutional, in neither case did the unwed father promptly take every step available to establish himself as a participating parent.
After Caban (supra), however, the Supreme Court considered the constitutionality of Domestic Relations Law § 111-a which provides that an unwed father has no right to receive notice of a proposed adoption where he fails to file with the Putative Father Registry (Lehr v Robertson, 463 US 248, supra). Mr. Lehr contended that the statute was unconstitutional in that it destroyed his relationship with his child without notice and an opportunity to be heard under the Due Process Clause. He further argued that the gender-based classification in the statute, which accorded him fewer rights than the infant’s mother, violated the Equal Protection Clause.
*918 The court upheld the constitutionality of Domestic Relations Law § 111-a as applied to Mr. Lehr because by waiting until his daughter was two years old to assert his fatherhood and offer support, he had not accepted a measure of responsibility for her future or sufficiently grasped the opportunity to be a father. Moreover, in Lehr (supra), the prospective adoptive father was the stepfather of the child and not a stranger.
It is obvious that the issues and the facts in Lehr (supra) and Baby Girl S. are quite different. Although Mr. Lehr had failed to support his child, rarely visited her and had never filed with the Putative Father Registry, he had commenced a proceeding to establish his paternity. But such proceeding was brought two years after his daughter’s birth and over a month after the adoption petition was filed.
During the pendency of the Lehr proceedings in the Family Court, the Supreme Court handed down its decision in Caban (supra). Mr. Lehr then contended that the failure to give him notice of the adoption violated the holding in Caban. The Court of Appeals rejected his claim on the ground that Caban was not retroactive (Matter of Jessica XX., 54 NY2d 417). The Supreme Court did not disagree (Lehr v Robertson, supra, at 253-254).
Although the circumstances in Lehr (supra) are different from those in the instant case, the court’s reasoning is instructive. Justice Stevens observed (supra, at 262) that: "[T]he biological connection * * * offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child’s development” (emphasis added).
In every way available to him, Gustavo has grasped the opportunity to develop a relationship with his daughter and accepted responsibility for her future. To hold that even though he meets this test, he is not entitled to enjoy a parent’s right to the companionship, care and custody of his child, "an interest far more precious than any property right” (Santosky v Kramer, 455 US 745, 758-759), would violate the Constitution.
To rule that no unwed father has a right to prevent an unwed mother from placing their child for adoption immediately at birth, would create an invidious gender-based distinc *919 tion between the rights of unwed fathers and unwed mothers. As the Supreme Court observed in Caban (supra, at 391): "The State’s interest in providing for the well-being of illegitimate children is an important one. We do not question that the best interests of such children often may require their adoption into new families who will give them the stability of a normal, two-parent home * * *. But the unquestioned right of the State to further these desirable ends by legislation is not in itself sufficient to justify the gender-based distinction of § 111 * * *. As we repeated in Reed v. Reed, 404 U.S., at 76, such a statutory 'classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.” ’ ” (emphasis added).
As previously mentioned, the State’s interest in facilitating adoption of out-of-wedlock children is to ensure their well-being. If the unwed mother does not assume custody of her child, the State’s concern is nonetheless met where the unwed father has come "forward to participate in the rearing of his child” (Caban v Mohammed, supra, at 392). Under such circumstances, he has the right (over strangers) to provide a permanent home for his child.
Under a literal construction of Domestic Relations Law § 111 (1) (e), even when an unwed father makes every effort to fulfill his parental responsibilities, his right to prevent the adoption of his child by strangers is dependent upon the whim of the unwed mother. If she chooses not to live with him during the last month of her pregnancy, such statute gives her the exclusive right to place their child at birth for adoption. Clearly, as applied to Gustavo, Domestic Relations Law § 111 (1) (e) is constitutionally flawed as it is inconsistent with rights guaranteed to him under the Due Process and Equal Protection Clauses of the Constitution (Caban v Mohammed, supra; Stanley v Illinois, supra; see, discussion and cases cited in Lehr v Robertson, supra, at 256-261).
Last, it would be unreasonable to require that Gustavo meet literally the criteria of Domestic Relations Law § 111 (1) (e). Such statute applies only in adoption proceedings and would not have been at issue in the custody and paternity applications in the Family Court, which were the first proceedings commenced. There, counsel for Regina (employed by Jane and Ed) delayed determination and withheld essential information from the court. Jane and Ed then raced to this court, where *920 they suppressed other vital facts, thus introducing a legal issue (Domestic Relations Law § 111), which would not otherwise have been in the case. It is improper to allow them to force Gustavo to meet a different and more stringent test simply because they are skillful at manipulating the judicial process to serve their purposes. Gustavo would then be caught between the deceptions Regina practiced on him before the birth of their daughter and the maneuvers of Jane and Ed thereafter. A result so unjust cannot be countenanced.
Based upon all the foregoing, the petition to adopt Baby Girl S. is denied.
To the extent that there is any dispute between them as to the custody of their daughter, Regina and Gustavo are referred back to the Family Court, Suffolk County.
The court expresses its appreciation to Professor Kevin C. Fogarty for his extraordinary services rendered without compensation.