2012 Ark. 92

**In the Matter of the ADOPTION
OF BABY BOY B., a minor.**

**No. 11–374.**

Supreme Court of Arkansas.

March 1, 2012.

Rehearing Denied April 12, 2012.

Hixson & Daniels, PLLC, Fayetteville, by: Alanna M. Fairrell, for appellant.

H. Keith Morrison, Little Rock, for appellees.

KAREN R. BAKER, Justice.

Appellant J.E.M., biological father of Baby Boy B., appeals from a Faulkner County Circuit Court order that determined that his consent to the adoption of Baby Boy B. was not required pursuant to Arkansas Code Annotated section 9–9–206(a)(2) (Repl.2009). Appellant argues that the circuit court erred by finding that his consent to the adoption was not required, by granting the decree of adoption in favor of appellees G.F.J. and S.L.J., and by finding that Arkansas Code Annotated sections 9–9–206(a)(2) and 9–9–207(a)(11) do not violate the Constitution of the United States. Our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(3) and (4) (2011), as the issues presented involve federal constitution interpretation and are of significant public interest. We reverse and remand.

Appellant and S.M.B. began dating while both were attending Southeast Missouri State University. In 2009, S.M.B. discovered that she was pregnant, and she and appellant visited Birth Right to get information about the pregnancy. S.M.B. signed up with an adoption agency and told appellant of her plans afterwards. S.M.B. told appellant that she would leave Missouri for the adoption; although appellant inquired where she would be going, she refused to tell him.

Shortly after learning of the adoption plan, appellant contacted an attorney in Missouri in order to find out about his parental rights. He did not ultimately retain that attorney. Appellant then filed with the Missouri Putative Father Registry on March 30, 2010. S.M.B. departed Missouri on or about May 13, 2010, moving to Lubbock, Texas, into housing furnished by Adoption Covenant, a non-profit child-placement agency. While S.M.B. was in Texas, she and appellant communicated by text messages and telephone calls, but she continued to conceal her whereabouts, even when appellant inquired. Appellant repeatedly told S.M.B. that he wanted them to be a family so that they could raise the unborn child together. However, appellant informed S.M.B. that the decision whether to put the baby up for adoption was hers.

Initially, the adoption was to be filed in Texas, and Adoption Covenant had an attorney draft the appropriate documents. In June and July 2010, that attorney sent several sets of documents to appellant so that he could relinquish his parental rights. Appellant refused to sign the documents, and he filed an original petition to establish parentage and an original petition affecting the parent-child relationship in Lubbock, Texas, on July 23, 2010. On July 24, 2010, appellant signed with the Illinois Putative Father Registry.[1] The

---

1. Appellant testified that he filed with the Illinois registry because it was where S.M.B. lived before attending college, and he thought she might return there to have the baby.

attorney working with Adoption Covenant learned about the filing of appellant's petitions in Texas and discussed the filing with S.M.B. Following this discussion, S.M.B. moved to Arkansas in late July or early August 2010. S.M.B. did not inform appellant of her move to Arkansas.

On or about August 3, 2010, appellant filed with the Texas Putative Father Registry. He attempted service on S.M.B. of the petition he had filed in Lubbock, Texas, but was unsuccessful. Appellant then learned that S.M.B. had moved to Arkansas, but was unaware of her specific location. He filed with the Arkansas Putative Father Registry on or about August 17, 2010. S.M.B. signed a relinquishment of parent-child relationship and a consent to guardianship and adoption on September 3, 2010. Baby Boy B. was born on September 4, 2010, in Washington County, Arkansas, and was placed with appellees in Pulaski County, Arkansas, on that same day. Appellant was not informed of the birth, and on September 8, 2010, filed a complaint for paternity and custody of an unborn child in the circuit court of Washington County, Arkansas.

A petition for temporary guardianship of Baby Boy B. was filed on September 8, 2010, in Faulkner County, Arkansas, stating that the putative father had never been married to the biological mother, that he had provided no support, and that his consent was not required pursuant to Arkansas Code Annotated section 9–9–206. The circuit court found that the matters stated in the petition were true and entered an order on September 9, 2010, appointing Grace Adoptions as temporary guardian. Appellees filed a petition for adoption on September 13, 2010, and appellant filed a complaint in intervention on or about October 19, 2010. On October 26, 2010, appellant filed a motion to transfer and consolidate the Washington County proceeding with the Faulkner County adoption case.

The motion was granted, and in Faulkner County Circuit Court, there was a guardianship case and a separate adoption case.

On November 16, 2010, a hearing was held to determine whether appellant's consent was required pursuant to Arkansas Code Annotated section 9–9–206. At the conclusion of the hearing, the circuit court determined that appellant's consent was not required. A decree granting the adoption of Baby Boy B. to appellees was entered on January 5, 2011. Appellant filed two separate appeals, one as to the guardianship and one as to the adoption. The instant case is a timely appeal from the decree of adoption.

We review issues of statutory construction de novo, as it is for this court to decide what a statute means. *Daimler-Chrysler Corp. v. Smelser*, 375 Ark. 216, 289 S.W.3d 466 (2008). In this regard, we are not bound by the circuit court's decision; however, in the absence of a showing that the circuit court erred, its interpretation will be accepted as correct on appeal. *Id.* However, when it is the circuit court's application of a statute to the facts before it, our standard of review is clearly erroneous. *Racine v. Nelson*, 2011 Ark. 50, 378 S.W.3d 93. A finding is clearly erroneous when, despite evidence to support it, we are left on the evidence with the firm conviction that a mistake has been committed. *Morningstar v. Bush*, 2011 Ark. 350, 383 S.W.3d 840.

Appellant argues that the circuit court erred in finding that pursuant to Arkansas Code Annotated section 9–9–206(a)(2) his consent to the adoption was not required because he failed to develop a significant custodial, personal, or financial relationship with Baby Boy B. He seeks reversal of the judgment, vacation of the decree of adoption in favor of appellees, and remand to the circuit court to allow him to proceed on his complaint for custody. The circuit

court found appellant's testimony credible regarding his efforts to form the relationship section 9–9–206 requires, stating "I do think [appellant] did everything he [could] to protect his rights." However, the court determined that the holding in *X.T. v. M.M.*, 2010 Ark. App. 556, 377 S.W.3d 442, required strict compliance with section 9–9–206(a)(2), and appellant did not prove that he had developed a significant custodial, personal, or financial relationship with Baby Boy B. before the petition for adoption was filed. Resolution of this issue requires this court to interpret section 9–9–206(a)(2).

Section 9–9–206(a)(2) reads as follows:

(a) Unless consent is not required under § 9–9–207, a petition to adopt a minor may be granted only if written consent to a particular adoption has been executed by:

(2) The father of the minor if the father was married to the mother at the time the minor was conceived or at any time thereafter, the minor is his child by adoption, he has physical custody of the minor at the time the petition is filed, he has a written order granting him legal custody of the minor at the time the petition for adoption is filed, a court has adjudicated him to be the legal father prior to the time the petition for adoption is filed, or he proves a significant custodial, personal, or financial relationship existed with the minor before the petition for adoption is filed[.]

The basic rule of statutory construction is to give effect to the intent of the legislature. *State Office of Child Support Enforcement v. Morgan*, 364 Ark. 358, 219 S.W.3d 175 (2005). In construing intent, we look to the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, legislative history, and other appropriate means that throw light on the subject. *Ford v. Keith*, 338 Ark. 487, 996 S.W.2d 20

(1999). "Parental rights and the integrity of the family unit have always been a concern of this state and their protection regarded as a proper function of the courts." *Matter of Adoption of Parsons*, 302 Ark. 427, 431–32, 791 S.W.2d 681, 683 (1990). We confirmed our position of giving careful protection to a natural parent's rights in *In re Adoption of Glover*, 288 Ark. 59, 702 S.W.2d 12 (1986):

[T]he power of the court in adoption proceedings to deprive a parent of her child, being in derogation of her natural right to it, and being a special power conferred by the statute, such statute should be strictly construed; that 'the law is solicitous toward maintaining the integrity of the natural relation of parent and child; and in adversary proceedings in adoption, where the absolute severance of that relation is sought, without the consent and against the protest of the parent, the inclination of the courts, as the law contemplates it should be, is in favor of maintaining the natural relation.... Every intendment should have been in favor of the claim of the mother under the evidence, and if the statute was open to construction and interpretation it should be construed in support of the right of the natural parent.'

*Id.* at 62–63, 702 S.W.2d at 13–14 (citing *Woodson v. Lee*, 221 Ark. 517, 254 S.W.2d 326 (1953) (quoting *In re Cordy*, 169 Cal. 150, 146 P. 532 (Cal.App.1914)).

We have also recognized that changes made by amendments may be helpful in determining legislative intent. *Am. Cas. Co. v. Mason*, 312 Ark. 166, 848 S.W.2d 392 (1993). In *In re Adoption of SCD*, 358 Ark. 51, 186 S.W.3d 225, (2004), we were "called upon to decide under what circumstances it is necessary to obtain the consent of a putative father before a child can be adopted pursuant to Arkansas Code Annotated section 9–[9]–206 (Repl.2002)."

*Id.* at 53–54, 186 S.W.3d at 225. That necessitated this court determining what the phrase "otherwise legitimated" means as section 9–9–206(a)(2), at that time, required the consent of a father who has otherwise legitimated the minor. The trial court ruled that timely registering with the Arkansas Putative Father Registry was sufficient to "otherwise legitimate" ⌐the child. Acknowledging that Arkansas courts had never defined the terms, we found that the father had "legitimated the child by filing with the putative father registry, initiating a petition to determine paternity, and taking other actions to establish his parentage." *Id.* at 59, 186 S.W.3d at 229.

In 2005, the General Assembly amended Arkansas Code Annotated sections 9–9–206 and 9–9–207. Act 437 was entitled "An Act to Clarify the Law Regarding Adoption Consent and Subsidized Adoptions." The Act deleted the "otherwise legitimated the minor" language from section 9–9–206(a)(2), replacing it with the requirement that, for the father's consent to be a prerequisite to an adoption, he must have a written order granting him legal custody at the time the petition for adoption is filed, or he must prove that a significant custodial, personal, or financial relationship existed with the minor before the petition for adoption was filed. Section 9–9–207 was also amended, adding subsections (10) and (11), which state that no consent to adoption is required of a father who fails to establish a significant custodial, personal, or financial relationship with the minor prior to the time the petition for adoption is filed, even if that father is listed on the Putative Father Registry or has signed an acknowledgment of paternity.

This legislative response to *In re Adoption of SCD* utilized language from *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), which involved New York's statutory scheme that protected an unmarried father's interest in assuming a responsible role in his child's future. The issue before the Supreme Court was whether the statutory scheme "adequately protected [the father's] opportunity to form ... a [custodial, personal, or financial] relationship" with his two-year-old[8] child. 463 U.S. at 263, 103 S.Ct. 2985. The Court concluded that Lehr had not established any significant relationship; therefore, he was not entitled to notice of the adoption proceeding. The Court noted that

> [t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Id.* at 262, 103 S.Ct. 2985. Based upon the foregoing considerations, the legislative intent in amending section 9–9–206(a)(2) was to extend protection to the father who establishes a significant custodial, personal, or financial relationship. But our inquiry does not end here. The crux of the first argument on appeal is what degree of compliance is necessary by the father such that his consent to an adoption of his minor child is required.

Appellant argues that there was only a period of approximately nine months within which he could have possibly formed a significant custodial, personal, and financial relationship with Baby Boy B. That period began in January 2010, when he learned of the pregnancy, and lasted until

September 13, 2010, the date the petition for adoption was filed. As Baby Boy B. was born on September 4, 2010, appellant states that aside from the time Baby Boy B. was in utero, he had only nine days to form the requisite relationship so that his consent to adoption is required under section 9–9–206(a)(2). Thus, appellant asks this court to evaluate his efforts to establish a significant custodial, personal, and financial relationship in light of the fact that S.M.B. thwarted his attempts by concealing her exact location from him after May of 2010. |₉Appellees contend that the statute requires literal compliance, which they assert appellant has failed to meet. They also argue that appellant failed to pursue "numerous steps available" to him in accordance with the X.T. court's statement that a putative father "can—and must—be as creative as necessary."

We have not previously considered a situation where a father's efforts to comply with section 9–9–206(a)(2) were thwarted by the mother of his newborn child. While the Arkansas Court of Appeals in *X.T. v. M.M., supra,* examined what constitutes a significant custodial, personal, or financial relationship under section 9–9–206(a)(2), we do not find its analysis applicable. In finding that the putative father's consent to the adoption was not required, the court in *X.T.* relied on several factors that distinguish that case from this present appeal. Specifically, the putative father was abusive toward the mother, causing her to limit contact with him. Also, the father's argument that he could not contribute to the child's support because he was unaware of the mother's address was not credible in light of his knowledge of the name and telephone number of the person with whom the mother was living. Finally, there were several persons with whom the father could have established indirect contact so as to render assistance or inquire about the mother's condition. In addition, *X.T.* relies on a concurring opinion from

the Kansas Court of Appeals, *In re Adoption of M.D.K.,* 30 Kan.App.2d 1176, 58 P.3d 745 (2002) (Beier, J., concurring), to determine what action must be taken by a putative father to comply with section 9–9–206(a)(2). To the extent *X.T.* adopts that standard and conflicts with this opinion, it is overruled.

Other jurisdictions have analyzed the efforts of the "thwarted putative father" in the |₁₀context of adoptions, and while their consent-to-adoption statutes differ from Arkansas's statute, their analysis is instructive as it relies on *Lehr, supra.* In *Matter of Raquel Marie X.,* 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418 (1990), a consolidated appeal pertaining to newborn infants, the fathers failed to comply with the literal statutory requirements giving them the right to consent to adoption of their children. The court of appeals stated that "[i]n the case of a child placed for adoption at birth, the father can have no more than a biological connection to the child, there having been no chance for a custodial relationship. Protection of this parental interest would depend, then, upon recognition of a . . . right to the opportunity to develop a qualifying relationship with the infant." *Id.* 559 N.Y.S.2d 855, 559 N.E.2d at 424. The court stressed that the father "who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his . . . child should have an equally fully protected interest in preventing termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship." *Id.* 559 N.Y.S.2d 855, 559 N.E.2d at 425.

In *Roe v. Reeves,* 392 S.C. 143, 708 S.E.2d 778 (2011), the state statute required the unwed father's consent to adoption if he made specified financial contributions to the mother and child. The court

found that Reeves's consent was not required because his efforts to comply with the statute had not been thwarted by the child's mother; however, the court said

> [W]e do not always require strict compliance with the literal requirements of section 63–9–310(A)(5)(b). For example, a father's ability to cultivate the sort of relationship we recognized in *Abernathy* [*v. Baby Boy,* 313 S.C. 27, 437 S.E.2d 25 (S.C.1993)] can be thwarted by the mother's refusal to accept the father's expressions of interest in and commitment to the child. We therefore extend the constitutional protection of a father's relationship with his child "not only when he meets the literal requirements of section 63–9–310(A)(5)(b), but also when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute." Otherwise, a father's constitutional right to form a relationship with his child that receives constitutional protection is subject to the whim of the mother.

*Id.* at 782 (internal citations omitted). In *Abernathy*, both the baby's mother and father were in the military when the mother became pregnant. The father provided some financial support during the pregnancy and expressed an interest in marrying the mother. When the father returned from sea duty, the mother determined that she did not want any further contact with him and attempted to hide from him. The father found out about the birth when the adoption action was filed and sought to intervene. The South Carolina Supreme Court recognized that his efforts to comply with the adoption statute had been thwarted by the mother's actions. Thus, *Raquel Marie X., Abernathy,* and *Reeves* affirmed that an unwed father seeking to enforce his right to object to an adoption of his minor child can establish good cause for failure to comply with the literal requirements of an adoption statute when his efforts were thwarted.

In this case, appellant testified regarding his efforts to form a significant custodial, personal, or financial relationship with Baby Boy B. in light of S.M.B.'s efforts to thwart him. He told his friends and his mother that S.M.B. was pregnant when he found out. He stated that he tried to go to the doctor with her but, despite his efforts, was unable to clear his schedule. They visited Birth Right, a place that furnishes basic information about pregnancies. He testified that he was romantically involved with S.M.B. from January until the time she left Cape Girardeau, Missouri, on approximately May 13, 2010. During that time, she stayed at his apartment approximately three to four nights a week, and they discussed the pregnancy. He stated that she never had much morning sickness, but he would rub her stomach and her back to try to comfort her as she was under a lot of stress. He purchased S.M.B. a Valentine's Day present, which consisted of a massage for her and the baby as well as a multi-purpose diaper/school bag. Appellant realized S.M.B. was leaving Missouri when she signed with an adoption agency; however, she would not inform him when or where she was going. Appellant stated that he ascertained she was living in Texas by contacting the adoption network through which she was working, and he was able to discern a partial address when she sent him an ultrasound of Baby Boy B. However, during this time, S.M.B. refused to give to him her exact address. Appellant testified that he expressed to S.M.B. concern for her welfare and that of their unborn child, and he suggested a name for the baby. He stated that he told S.M.B. that he was always there for her.

Appellant stated that he contacted four different attorneys, two in Missouri, one in Texas, and one in Arkansas. He said that

he did not reveal his plan to try to block the adoption to either S.M.B. or the adoption-agency attorney in Texas, but he said that he never signed any of the multiple sets of documents sent to him by the agency to relinquish his parental rights. He admitted that he did not provide financial support to S.M.B. during the pregnancy and was aware that she sometimes worked more than one job when she was living in Texas. He stated that his mother loaned him $1,100 to open a checking account for the benefit of Baby Boy B. At the time of the hearing, he did not have a job. Appellant filed with putative-father registries in Missouri, Texas, Arkansas, and Illinois, and filed two separate paternity and custody actions, one in Texas and one in Arkansas, before the petition for adoption was filed.

After considering the testimony of appellant, S.M.B., and the exhibits, the circuit court found that appellant had done all that he could do to protect his rights under the circumstances. This court gives great deference to a circuit court's findings of fact. *Save Energy Reap Taxes v. Shaw*, 374 Ark. 428, 288 S.W.3d 601 (2008). Clearly, S.M.B. thwarted appellant's efforts to comply with section 9–9–206(a)(2).

Under the circumstances presented in this case, appellant took steps to form a significant custodial, personal, or financial relationship with Baby Boy B. He had not only filed with the putative-father registries in four states but had also filed paternity actions in both Texas and Arkansas. He had provided some support to S.M.B. during the pregnancy and had established an account for the support of the baby. Appellant did not furnish financial support to S.M.B. after she left Missouri, but she refused to inform him of her specific location. While appellees suggest that he could have done more, that is not the question. Instead, the question is whether appellant's efforts to establish a significant

custodial, personal, or financial relationship, in light of S.M.B.'s thwarting of his efforts, were sufficient such that his consent to the adoption was required pursuant to section 9–9–206(a)(2). We hold that they were. And, because they were, the circuit court's finding that appellant's consent to the adoption was not required is clearly erroneous. Accordingly, we reverse the finding that appellant's consent is not required, vacate the decree of adoption, and remand for further proceedings consistent with this opinion.

Appellant's second argument is that because he demonstrated that his consent to the adoption was required, the circuit court erred in granting the adoption in favor of appellees pursuant to Arkansas Code Annotated sections 9–9–206(a)(2) and 9–9–207(a)(11) without a finding that appellant unreasonably withheld consent under Arkansas Code Annotated section 9–9–220. Appellant requests that we vacate the adoption and allow him to proceed in his complaint for custody or, in the alternative, vacate the adoption and remand for a determination of whether he unreasonably withheld his consent. Considering our disposition of appellant's first argument, it is unnecessary for us to address this argument.

Appellant's third argument is that Arkansas Code Annotated sections 9–9–206(a)(2) and 9–9–207(a)(11) are unconstitutional. While appellant clearly requested the circuit court to rule on this issue, the court declined. The order states:

[Appellant] properly requested a ruling on the constitutionality of Ark.Code Ann. § 9–9–206 and 9–9–207, but the Court declined to rule on the constitutionality of said statutes. The constitutionality arguments were properly raised and preserved for appeal.

The order is incorrect in finding that the constitutionality arguments are preserved

for appeal. To preserve an argument for appeal, even a constitutional one, a party must obtain a ruling from the circuit court. *Carson v. Cnty. of Drew*, 354 Ark. 621, 128 S.W.3d 423 (2003). While the circuit court may not be the final arbiter of a statute's constitutionality, it must rule on the issue in order to preserve the issue for appeal. Because appellant did not obtain a ruling on whether Arkansas Code Annotated sections 9–9–206(a)(2) and 9–9–207(a)(11) violate the United States Constitution, the issue is not preserved for appellate review, and we do not address it.

Reversed and remanded.

CORBIN and DANIELSON, JJ., concur.

PAUL E. DANIELSON, Justice, concurring.

Here, J.E.M. was required to present proof of a significant custodial, personal, or financial relationship in order for his consent to be required pursuant to Arkansas Code Annotated § 9–9–206(a)(2) (Repl. 2009).[1] Like the majority, it is my opinion that he did; however, because I reach my conclusion somewhat differently, I concur.

### Custodial Relationship

In the case before us, the child at issue was in utero, and it is undisputed that J.E.M. did not have legal or physical custody of his child; thus, the relevant inquiry is whether J.E.M. had a significant custodial relationship with Baby Boy B. The term "custody" has been defined as "[t]he care and control of a thing or person for inspection, preservation, or security." *Black's Law Dictionary* 441 (9th ed.2009). However, as one court has observed, "[i]n the case of a child placed for adoption at birth, the father can have no more than a biological connection to the child, there

having been no chance for a custodial relationship." *In re Raquel Marie X.*, 76 N.Y.2d 387, 401, 559 N.Y.S.2d 855, 559 N.E.2d 418, 424 (N.Y.1990). While there was no chance for a custodial relationship as that term traditionally connotes, J.E.M. did file with four states' putative-father registries and filed petitions for paternity and custody in two different states, all prior to the filing of the petition for adoption. As the New York court stated:

> [I]n in adoption proceeding by strangers, an unwed father who has been physically unable to have a full custodial relationship with his newborn child is also entitled to the maximum protection of his relationship, so long as he promptly avails himself of all the possible mechanisms for forming a legal and emotional bond with his child.... This implies, however, that in order to have the benefit of the maximum protection of the relationship—the right to consent to or veto an adoption—the biological father not only must assert his interest promptly (bearing in mind the child's need for early permanence and stability) but also must manifest his ability and willingness to assume custody of the child.

*Id.* at 402, 559 N.Y.S.2d 855, 559 N.E.2d at 424 (internal citations omitted).

It is my opinion that, despite the mother's continued attempts to evade J.E.M. and keep her whereabouts secret, J.E.M. nonetheless embraced all possible methods of establishing that he was the child's father and his desire for custody. While the adoptive parents argue that attempts at such a relationship are insufficient, or in essence, that strict compliance is required, I disagree. In *Abernathy v. Baby Boy*, 313 S.C. 27, 437 S.E.2d 25 (1993), the South Carolina Supreme Court rejected a similar argument.

---

1. I would note that the statute only requires that a putative father prove one of the three.

It just so happens that in the instant case, J.E.M. proved each.

There, the adoptive parents argued that an unwed father's consent to adoption was not required unless he complied with the literal requirements of South Carolina's consent statute, which mandated that a father provide for the support of his child before the state was compelled to seek his consent to the adoption of the child. Noting that an unwed father's opportunity interest is "constitutionally protected only to the extent that the biological father who claims protection wants to make the commitments and perform the responsibilities that give rise to a developed relationship, because it is only the combination of biology and custodial responsibility that the Constitution ultimately protects," the court explained that "[t]he specific acts undertaken by the unwed father to preserve his inchoate relationship with his child, as well as the nature of the relationship he wishes to foster with the child, are of considerable importance in determining whether the unwed father has evinced a commitment to his child deserving of protection." 313 S.C. at 31, 437 S.E.2d at 28. The court continued:

> Against this background, we must ascertain the interaction between the requirements of section 20–7–1690(A)(5)(b) and the unusual facts before us. As always, our primary function in interpreting a statute is to ascertain the intent of the Legislature. *Spartanburg Cty. Dep't of Social Svcs. v. Little*, 309 S.C. 122, 420 S.E.2d 499 (1992). A statute must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers. *Id.* We find that by enacting section 20–7–1690(A)(5)(b), the Legislature contemplated establishing general minimum standards by which an unwed father timely may demonstrate his commitment to the child, and his desire to "grasp [the] opportunity," *Lehr*, 463 U.S. at 262, 103 S.Ct. 2985, to assume full responsibility for his child. However, as shown by the events leading to this appeal, an unwed father's ability to cultivate his opportunity interest in his child can be thwarted by the refusal of the mother to accept the father's expressions of interest in and commitment to the child. Accordingly, we conclude that an unwed father is entitled to constitutional protection not only when he meets the literal requirements of section 20–7–1690(A)(5)(b), *but also when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute.* See In re Chandini, 166 A.D.2d 599, 560 N.Y.S.2d 886 (1990); In re Adoption of Baby Girl S., 141 Misc.2d 905, 535 N.Y.S.2d 676 (N.Y.Surr.1988); In re Baby Girl Eason, 257 Ga. 292, 358 S.E.2d 459 (1987); In re Riggs, 612 S.W.2d 461 (Tenn.Ct. App.1980), cert. denied, 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981). To mandate strict compliance with section 20–7–1690(A)(5)(b) would make an unwed father's right to withhold his consent to adoption dependent upon the whim of the unwed mother. See In re Adoption of Baby Girl S., 141 Misc.2d 905, 535 N.Y.S.2d 676 (N.Y.Surr.1988).

*Id.* at 29 (emphasis added).

Likewise, this court should recognize "sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute." *Id.* at 29.[2] J.E.M. clearly employed all methods available to him to establish a significant custodial re-

---

**2.** Indeed, this court does strictly construe adoption statutes; however, this court, strictly construes the statutes in favor of the natural parents. In *In re Glover*, this court explained:

The court gives careful protection to a natural parent's rights. As announced in *Woodson v. Lee*, 221 Ark. 517, 254 S.W.2d

lationship with the child, as much as one can be established with a child in utero, and despite the mother's attempts to evade and exclude him. Given that J.E.M. made sufficient prompt and good faith efforts to assume a significant custodial relationship and to comply with that portion of the statute, it is my opinion that the circuit court clearly erred in finding that his consent was not required under section 9–9–206.

### Personal Relationship

Again, the fact that the instant child was in utero must be taken into consideration when determining whether J.E.M. proved a significant personal relationship with the child prior to the adoption petition being filed. It is my opinion that he did and certainly so if we consider whether he made sufficient prompt and good faith efforts to do so. A review of the testimony before the circuit court demonstrates that J.E.M. never indicated his direct support for the route of adoption; to the contrary, he several times indicated his desire to the mother that they be a family. He further indicated his willingness to move closer to her family and to obtain a job to support the baby, and he certainly demonstrated care and empathy toward the mother during her pregnancy, both while she was near him and when she was evading him. J.E.M. inquired as to the mother's health, what was good for the baby, and its welfare. He further thought of [19]names and

embraced the idea of being a father. In addition, his filing of the petitions for paternity and custody were indicative of his desire to establish a relationship and to voice his opposition toward anything other than a relationship with his child. Considering J.E.M.'s actions and statements, in light of the fact that the child was in utero and the mother's evasion while pregnant, it is my opinion that J.E.M. made sufficient and prompt good faith efforts to establish a personal relationship with his child. Accordingly, because he proved a significant personal relationship with his child, under the facts before us, I would reverse the circuit court's finding that his consent was not required under section 9–9–206.

### Financial Relationship

The final method by which J.E.M.'s consent could be required under the statute was if he proved a significant financial relationship with the child prior to the filing of the adoption petition. Here, the evidence presented to the circuit court demonstrates that, while he did not do in great amounts, J.E.M. did establish a savings account for the benefit of Baby Boy B. J.E.M. admitted that he did not provide funds to the mother during her pregnancy; while he did provide her with a massage and a diaper bag, he did not attempt to provide her with funds to aid with living or medical expenses during her pregnancy. That being said, he also did not know her exact location for an extended period of

326 (1953), quoting *In re Cordy*, 169 Cal. 150, 154, 146 P. 532 (1914),

> ... the power of the court in adoption proceedings to deprive a parent of her child, being in derogation of her natural right to it, and being a special power conferred by the statute, such statute should be strictly construed; that 'the law is solicitous toward maintaining the integrity of the natural relation of parent and child; and in adversary proceedings in adoption, where the absolute severance of that relation is sought, without

the consent and against the protest of the parent, the inclination of the courts, as the law contemplates it should be, is in favor of maintaining the natural relation.... Every intendment should have been in favor of the claim of the mother under the evidence, and *if the statute was open to construction and interpretation it should be construed in support of the right of the natural parent.'*

288 Ark. 59, 62–63, 702 S.W.2d 12, 13–14 (1986) (emphasis added).

the pregnancy, due to the mother's attempts to evade him, which I believe should be taken into consideration. J.E.M. testified that he did borrow money from his mother and established a savings account that he intended to use for the baby's expenses. While he was unable to put the funds in the child's name, he stated his intent for the funds, and the adoptive parents were unable to dispute his claimed intent. While perhaps not a *significant* financial relationship, he did attempt to establish one. For this reason, I would say that the circuit court again erred in concluding that J.E.M.'s consent was not required.[3]

For the foregoing reasons, I concur.

CORBIN, J., joins.

---

**3.** To the extent that the court of appeals' opinion in *X.T. v. M. M.*, 2010 Ark. App. 556, 377 S.W.3d 442, conflicts with my analysis, I, like the majority, would overrule it. Also, to the extent the parties believe a determination of whether J.E.M. is unreasonably withholding consent is required under section 9–9–220(c)(3) (Repl.2009), I disagree. That provision, in my opinion, is simply inapplicable where one has just proved a significant custodial, personal, or financial relationship.