

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-14-495

| | | |
|---|---|---|
| | | **Opinion Delivered**  September 16, 2015 |
| T.R. | APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [No. DR2013–1875-5] |
| V. | | |
| | | HONORABLE XOLLIE DUNCAN, JUDGE |
| L.H., P.M., AND S.M. | APPELLEES | AFFIRMED |

## LARRY D. VAUGHT, Judge

Appellant T.R.,[1] the putative father of A.E.M., appeals from the decrees entered by the Circuit Court of Benton County, granting the adoption petition filed by appellees P.M. and S.M. and finding that T.R.'s consent to the adoption was not required, T.R. was unreasonably withholding his consent, and adoption was in A.E.M.'s best interest. On appeal, T.R. argues that the trial court clearly erred in finding that his consent was not required; the trial court clearly erred in finding that he unreasonably withheld his consent and adoption was in A.E.M.'s best interest; his constitutional rights to due process were violated; the trial court abused its discretion in failing to recuse; and his counsel was ineffective. We affirm.

In March and April 2013, T.R. was involved in a romantic relationship with appellee L.H., and they had unprotected sex. Their relationship ended on April 27, 2013. A couple

---

[1]An order sealing this case was granted by the trial court; therefore, the names of the parties are abbreviated.

of weeks later, L.H. discovered that she was pregnant. She did not advise T.R. of the pregnancy. Within days of learning of her pregnancy, L.H., who was divorced with custody of her own two young children, made the decision to place the baby for adoption. L.H. met the adoptive parents, P.M. and S.M., in mid-May 2013, and they supported her financially and emotionally from that point until the birth of A.E.M. on December 30, 2013. A.E.M. went home with P.M. and S.M. and has been in their custody since that time.

After the relationship between T.R. and L.H. ended, they had no contact with one another. On November 11, 2013, T.R. learned of L.H.'s pregnancy from L.H.'s friend. The following day, T.R. filed his information with the putative-father registry. On November 13, 2013, he filed a petition to establish paternity and to object to the adoption of the child.

On December 11, 2013, P.M. and S.M. filed a petition to adopt A.E.M. The petition stated that an inquiry would be made with the Arkansas Putative Father Registry to ascertain if any information had been filed with regard to L.H.'s baby. An amended petition for adoption was filed January 3, 2014, wherein P.M. and S.M. alleged that the putative father had filed with the registry but had failed to comply with the requirement of Arkansas Code Annotated section 9-9-206(a)(2).

T.R. filed a motion to consolidate the paternity and adoption cases on January 3, 2014. The trial court granted the motion on January 29, 2014. Thereafter, L.H. moved to bifurcate the cases, and on February 13, 2014, the trial court granted L.H.'s motion.[2]

---

[2]On April 8, 2014, the trial court entered an order closing the paternity case.

The adoption hearing was held February 10, 2014. T.R. testified that when he learned of L.H.'s pregnancy, he attempted to contact her, but she thwarted his efforts. Additionally, he said he tried to contact L.H.'s sister, L.H.'s ex-husband's aunt and his other children's mother, but he (T.R.) was ignored. He testified that he filed papers with the putative-father registry, and he filed a paternity suit. He conceded that despite having unprotected sex with L.H., he did nothing to find out if L.H. was pregnant after their relationship ended. While he did not offer to give L.H. money during her pregnancy, he testified that she could have called him and asked him for help. He testified that since he learned of L.H.'s pregnancy, he had been making preparations for A.E.M. Three days before the adoption hearing, he secured an apartment. He had also purchased multiple baby items and had submitted resumes to get a higher-paying job. And because he worked nights as the manager of a hotel,[3] he had also made arrangements with his grandmother, who was in her eighties, to care for A.E.M. during the day.

T.R. listed eight women with whom he had had relationships with since 2006. He had three children, A.E.M., C.R.[4] and E.R.,[5] out of wedlock with three of the women. And he said that since 2006, he and C.R. had stayed overnight at one or more of these women's residences. He had joint custody of C.R. and was ordered to pay child support for him. T.R. said that he was under an order to pay child support for E.R. as well but that he had not seen

---

[3]T.R. testified that in November 2013, he left his job at the Fayetteville Police Department.

[4]C.R. was six years old at the time of the hearing.

[5]E.R. was four years old at the time of the hearing.

him in two years because his mother, who was seventeen years old when she became pregnant with E.R., would not permit it. He added that he planned to pursue custody of E.R. after he saved sufficient funds for an attorney. T.R. began dating his current girlfriend, Teresa, in mid–November 2013, approximately three days after she was arrested for possession of drug paraphernalia. He testified that she no longer smoked marijuana.

T.R. testified that it was his goal to have custody of all three of his children. He said that he had no problem meeting his financial obligations, including his child-support obligations. However, he later conceded that his child-support obligations were not current.

L.H. testified that she ended her relationship with T.R. on April 27, 2013, when she witnessed inappropriate conduct between C.R. (who was five years old at the time) and her four-year-old daughter. She said that she found out she was pregnant a couple of weeks later. She believed T.R. to be the father. She admitted not notifying T.R. of her pregnancy, but she stated that she did not do anything to avoid him. She said that her address and email address never changed. Also, until November 2013, her phone number remained the same.

L.H. testified that she believed P.M. and S.M. were great and that they helped her through the pregnancy. She said that she did not believe T.R. was raising C.R. in the right way, criticizing him for not providing proper shelter for C.R. She did not believe that T.R would be capable of caring for all three of his children.

Social worker Karen Scott testified as an expert witness in this case. She performed the home study on P.M. and S.M., approving them for the adoption. Additionally, she opined that T.R. had an unstable life and was not providing for either C.R. or E.R. Scott said that

T.R. and C.R. were "barely making it," and she was very concerned that T.R. did not see E.R. and that T.R. chose to pursue custody of A.E.M. instead of custody of E.R., especially if E.R.'s mother was subjecting E.R. to drug dealers as claimed by T.R. Scott was also concerned that T.R. had multiple girlfriends and residences and that he had involved C.R. in all of them. She questioned T.R. because he did not follow up with L.H. to inquire if she were pregnant, and he failed to offer to help her when he discovered the pregnancy. She added that L.H. had the obligation to tell T.R. about the pregnancy.

P.M. and S.M. both testified that they did not believe that T.R. was providing for either C.R. or E.R. They pointed out that T.R. was behind in his child-support obligations for both children and had no relationship at all with E.R. It was the opinion of S.M. that because T.R. had exposed C.R. to at least five women in the quasi-stepmother role—one of whom had drug charges pending—that T.R. was not providing a stable and healthy home for C.R. And P.M. testified that T.R. had failed to provide support to A.E.M., which he was obligated to do by statute. Both P.M. and S.M. requested that the trial court grant the adoption.

From the bench, the trial court found that T.R.'s consent to the adoption was not required. And assuming that consent to the adoption was required, the court further found that T.R. was unreasonably withholding consent. Finally, the court found that it was in the best interest of A.E.M to be adopted. In reaching these findings, the trial court found that T.R. was not a credible witness and that he could not care or provide for A.E.M. Thereafter, the trial court entered two decrees of adoption. This appeal followed.

Adoption proceedings are reviewed de novo. *In re A.R.*, 103 Ark. App. 1, 3, 285 S.W.3d 716, 717 (2008). Adoption statutes are strictly construed, and a person wishing to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence. *Id.*, 285 S.W.3d at 717. A trial court's finding that consent is unnecessary due to a failure to support or communicate with the child will not be reversed unless clearly erroneous. *Id.*, 285 S.W.3d at 717. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* at 3–4, 285 S.W.3d at 717–18. We defer to the trial court in making credibility determinations because the trial court is in a better position to judge the credibility of witnesses. *Id.* at 4 , 285 S.W.3d at 718.

T.R.'s first point on appeal is that the trial court clearly erred in finding that his consent to adoption was not required.[6] He claims that by statute—Arkansas Code Annotated sections 9-9-206 and 9-9-207—his consent was required.

Arkansas Code Annotated section 9-9-206 lists the people who are required to consent to adoption. Subsection (a) provides that, unless consent is not required under section 9-9-

---

[6]Appellees contend that T.R. lacks standing to contest the adoption because he failed to obtain a ruling on his petition for paternity and then filed a notice of appeal waiving all pending but unresolved claims. They argue, "T.R. lacks standing to pursue his appeal because he is no longer a putative father, and he cannot be adjudicated to be the father." While T.R. abandoned his paternity claim and has not been legally declared A.E.M.'s father, we disagree that he is no longer A.E.M.'s putative father. A "putative father" is defined as any man not legally presumed or adjudicated to be the biological father of a child, but who claims or is alleged to be the biological father of the child. *Racine v. Nelson*, 2011 Ark. 50, at 15, 378 S.W.3d 93, 102 (citing *McAdams v. McAdams*, 353 Ark. 494, 109 S.W.3d 649 (2003)). T.R. claims to be the biological father of A.E.M., and L.H. agreed. Therefore, we reject the appellees' argument that T.R. lacks standing to contest the adoption.

207, a petition to adopt a minor may be granted only if written consent to a particular adoption has been executed by:

> (2) The father of the minor if:
> (A) The father was married to the mother at the time the minor was conceived or at any time thereafter;
> (B) The minor is his child by adoption;
> (C) He has physical custody of the minor at the time the petition is filed;
> (D) He has a written order granting him legal custody of the minor at the time the petition for adoption is filed;
> (E) A court has adjudicated him to be the legal father prior to the time the petition for adoption is filed;
> (F) He proves a significant custodial, personal, or financial relationship existed with the minor before the petition for adoption is filed; or
> (G) He has acknowledged paternity under § 9-10-120(a).

Ark. Code Ann. § 9-9-206(a)(2)(A)–(G) (Repl. 2013). The facts are undisputed that T.R. does not fall within subsections (A)–(E) or (G). He was not married to L.H. at any time; A.E.M. is not his child by adoption; he did not have physical or legal custody of A.E.M. at the time the petition for adoption was filed; no court had adjudicated T.R. to be A.E.M.'s legal father; and he had not filed an acknowledgment of paternity pursuant to Arkansas Code Annotated section 9-10-120(a). The only subsection that might apply is (F)—that he proved a significant custodial, personal, or financial relationship existed with A.E.M. before the petition for adoption was filed.

T.R. contends that in the short amount of time he was given by L.H. (when he learned of the pregnancy in November 2013, to when the date the adoption petition was filed in December 2013), he established the requisite relationship with A.E.M.; therefore, his consent was required. He argues that within that one-month period, he registered as a putative father and filed a paternity petition. He also contends that he went to "great lengths"

to locate and communicate with L.H. In the months following, he secured an apartment, searched for better employment, and purchased baby items—all of which he claims demonstrated that he developed a significant custodial, personal, or financial relationship with A.E.M.

It is not disputed that in the one-month period between learning of L.H.'s pregnancy and the filing of the adoption petition, T.R. registered as a putative father and filed a paternity action. However, as pointed out by the trial court, he did little else before, during, or after that one-month period to establish the required relationship with A.E.M. T.R. failed to set money aside to help L.H. with pregnancy expenses or future expenses so that L.H. could keep the baby. He did not set aside any money for A.E.M.'s benefit. He did not offer to provide transportation to or to attend L.H.'s doctor's visits. He did not ask to see ultrasound pictures of the baby. Securing an apartment and searching for a better-paying job are not specific to A.E.M. He said he visited with his grandmother about providing daycare for the baby, but the grandmother did not confirm the arrangement. She did not attend the hearing at T.R.'s request. Essentially, T.R. purchased some baby items, and the trial court found that such efforts failed to prove that he created a significant custodial, personal, or financial relationship with A.E.M. Therefore, we hold that the trial court did not clearly err in finding that consent was not required under section 9-9-206(a)(2)(F).

T.R. relies on *In re Baby Boy B*, 2012 Ark. 92, at 13, 394 S.W.3d 837, 844, wherein our supreme court held that the mother thwarted the putative father's best efforts to establish a relationship with his child and that his consent was therefore required for the adoption.

8

T.R.'s reliance is misplaced because the facts are distinguishable. The putative father in *Baby Boy B* was involved with the pregnancy from the start. His relationship with the mother continued for approximately five months after they learned of the pregnancy. *Id.* at 11, 394 S.W.3d at 843. During that time, she stayed at his apartment approximately three to four nights a week, and they discussed the pregnancy. *Id.*, 394 S.W.3d at 843. He knew and described how she felt during the pregnancy and tried to comfort her. *Id.* at 11–12, 394 S.W.3d at 843. He purchased the baby a Valentine's Day present, which consisted of gifts for the mother and baby. *Id.* at 12, 394 S.W.3d at 843. He had ultrasound pictures of the baby that the mother had given him, he suggested a name for the baby, and he told the mother that he was always there for her. The mother ultimately decided to place the baby with an adoption agency. She told the putative father of her plans: she would leave Missouri (where they were attending college) for the adoption, and she would not tell him where she was going. The mother moved to four states, refusing to advise the putative father of her address despite his requests. He was able to ascertain where she was, he registered as the putative father in all four states, and he filed paternity actions in two states. *Id.* at 12–13, 394 S.W.3d at 844. He contacted two attorneys in Missouri, one in Texas, and one in Arkansas. *Id.* at 12, 394 S.W.3d at 844. He placed $1,100 in a checking account for the benefit of Baby Boy B. *Id.* at 12, 394 S.W.3d at 844.

T.R. did not establish a significant custodial, personal, or financial relationship with A.E.M. as the putative father did in *Baby Boy B.* And the facts in the instant case fail to support T.R.'s argument that L.H.'s actions thwarted his efforts in creating that type of

relationship. Unlike the mother in *Baby Boy B*, L.H. did not move to avoid T.R. In fact, L.H. did not move at all. She stayed in the same apartment that she once shared with T.R. She did not change her phone number until November 2013. She did not change her email address. Other than changing her phone number seven months after they broke up, the only other evidence of L.H.'s avoidance of T.R. was blocking him on Facebook.

T.R. argues that he could not have had a relationship with A.E.M. while she was in utero because L.H. did not tell him she was pregnant. However, this argument has been criticized and rejected by our supreme court. In *Escobedo v. Nickita*, 365 Ark. 548, 231 S.W.3d 601 (2006), the putative father had a brief romantic relationship with a woman, which resulted in an unprotected sexual encounter. The putative father did not see or talk with the woman after the encounter, and he did not know that she had become pregnant. The putative father learned of the pregnancy the month the child was born. *Id.* at 550, 231 S.W.3d at 602. The trial court granted a petition for adoption, finding that neither notice to nor consent from the putative father was required. *Id.* at 549, 231 S.W.3d at 602. Our supreme court affirmed the adoption, and Justices Imber and Brown, in separate concurrences, stated that a putative father has the obligation to discover the existence of his child, even if he had no notice of the pregnancy or birth, or risk losing the opportunity to transform a biological link into a full and enduring parental relationship. *Id.* at 559–64, 231 S.W.3d at 609–12. Justice Imber further stated that it was immaterial that the putative father was unaware of the child's existence, stating that "[w]e have held, along with numerous other courts, that the putative father's lack

10

of knowledge is not sufficient grounds upon which to exempt him from the statutory requirements."[7] *Id.* at 566, 231 S.W.3d at 613–14.

Despite the knowledge that he and L.H. had unprotected sex, T.R. admittedly failed to follow up with L.H. and inquire about the possibility of a pregnancy once their relationship ended. Under Arkansas law, he had the burden to do so. He also had the opportunity to do so as the evidence revealed that L.H. lived in the same apartment, had the same email address, and had the same phone number. Therefore, his argument that he was unable to foster a significant relationship with A.E.M. while in utero lacks merit.

T.R. argues that his consent to A.E.M.'s adoption was also required under Arkansas Code Annotated section 9-9-207(a)(11) (Repl. 2009). This section provides that consent to adoption is not required of "a putative father of a minor who is listed on the Putative Father Registry but who failed to establish a significant custodial, personal, or financial relationship with the juvenile prior to the time the petition for adoption is filed." He claims that he was listed on the putative-father registry and that he established the requisite relationship with A.E.M. prior to the time the petition for adoption was filed. As set forth above, we disagree that T.R. established the necessary relationship; thus, we hold that the trial court did not clearly err in finding that T.R.'s consent was not required under section 9–9–207(a)(11).

---

[7]We acknowledge that the *Escobedo* court was interpreting a prior version of the consent statute, which generally provided that consent was required if the putative father had "otherwise legitimated" the child. Ark. Code Ann. § 9-9-206(a)(2) (Repl. 2002). While the current version of the consent statute differs in its language, the reasoning of Justices Imber and Brown applies equally to the current statute.

SLIP OPINION

Assuming, arguendo, that T.R.'s consent to the adoption was required, the trial court also found that T.R. unreasonably withheld consent and that it was in A.E.M.'s best interest that the adoption be approved. By law, the relationship of parent and child may be terminated by a court order issued under this subchapter when, in the case of a parent not having custody of a child, his or her consent is being unreasonably withheld contrary to the best interest of the child. Ark. Code Ann. § 9-9-220(c)(3) (Repl. 2009). "Best interest" means more than station in life and material things—it includes moral, spiritual, material and cultural values, matters of convenience, and friends and family relationships. *Lagios v. Goldman*, 2015 Ark. App. 329, at 11, 463 S.W.3d 726, 733. We will not reverse a trial court's decision regarding the best interest of a child to be adopted unless it is clearly against the preponderance of the evidence, giving due regard to the opportunity and superior position of the trial court to judge the credibility of the witnesses. *Id.*, 463 S.W.3d at 733. Great weight is given to a trial court's personal observations when the welfare of young children is involved. *Id.*, 463 S.W.3d at 733.

In making the decision whether to terminate the parental rights of a party, the trial court has the duty to look at the entire picture of how that parent discharged his duties as a parent, the substantial risk of serious harm the parent imposed, and whether or not the parent was unfit. *In re K.M.C.*, 62 Ark. App. 95, 97, 969 S.W.2d 197, 199 (1998). Any evidence having probative value as to the present or prospective fitness of a parent is admissible to determine whether consent has been unreasonably withheld. *Id.*, 969 S.W.2d at 199. Past actions over a meaningful period serve as good indicators of what the future may be expected

12

to hold. *Id.* at 98, 969 S.W.2d at 199 (citing with approval *Frye v. Spotte*, 359 S.E.2d 315 (Va. Ct. App. 1987)).

Considering T.R.'s past actions over a meaningful period of time, we cannot say that the trial court clearly erred in finding that it was in the best interest of A.E.M. to be adopted by P.M. and S.M. The trial court, after weighing the evidence and the credibility of the witnesses, found that T.R. was marginally self-sufficient, underemployed,[8] and lacked stability. Specifically, it found that T.R. was struggling to make it with the two children he already had. The court pointed out that it appeared that T.R. was actually just caring for himself and that C.R. was "trailing along with him." During 2013, T.R. lived in the back room of a friend's house. C.R. did not have his own room and either slept with his father or on a sofa bed. When T.R. stayed the night at L.H.'s apartment, C.R. slept on the floor. T.R. testified that C.R. spent the night at more than one of his girlfriends' residences. And T.R. had no relationship with E.R.—he had not seen E.R. in at least two years. The trial court was concerned that T.R. was not pursuing custody of E.R., especially in light of T.R.'s claim that E.R.'s mom was subjecting him to drug dealers. There was evidence that T.R. had been romantically involved with eight women since 2006. He had three children out of wedlock with three of the women. One woman was seventeen when she became pregnant. His current girlfriend had been recently arrested on drug charges. The court also found that T.R.'s income would not be able to cover his expenses for all three children, including the new

---

[8]T.R. took a $4.00 per hour pay cut when he quit his job at the Fayetteville Police Department and began working as the night manager of a hotel.

apartment T.R. secured just days before the hearing. In fact, the trial court predicted that T.R. would have that apartment for only one month regardless of the outcome of the adoption hearing. In contrast, the evidence demonstrated that P.M. and S.M. had stable employment and housing and that they were kind and loving parents. Therefore, based on our de novo review, we cannot say that the trial court's decision that T.R. was unreasonably withholding consent and that it was in A.E.M.'s best interest to be adopted by P.M. and S.M. is clearly against the preponderance of the evidence.

T.R. also argues on appeal that the trial court violated his constitutional right to due process in that he was not provided the opportunity to be heard at a meaningful time and in a meaningful manner. Under this point, he also contends that there are "fairness issues" due to the trial court's impartiality. However, T.R. failed to raise these arguments below. *Lucas v. Jones*, 2012 Ark. 365, at 9, 423 S.W.3d 580, 585 (holding that arguments not raised below, even constitutional ones, are waived on appeal). T.R. acknowledges his failure to raise the due-process claims below; thus, he asks that we make an exception when "the constitutional right is so basic and fundamental as in a father's right to raise his child." However, he cites no authority for this argument. It is well established that we will not consider an argument when the appellant presents no citation to authority or convincing argument in its support, and it is not apparent without further research that the argument is well taken. *Steele v. Lyon*, 2015 Ark. App. 251, at 2, 460 S.W.3d 827, 830. Therefore, we affirm on this point.

Next, T.R. argues that the trial court abused its discretion in failing to recuse. After the adoption hearing, and after the trial court had entered its adoption decrees, the trial court

14

held a hearing on P.M. and S.M.'s motion to seal the record. At this hearing, T.R. requested that the trial court recuse because P.M. and S.M. were both attorneys who were acquainted with and/or had previously appeared before the trial judge. The trial court denied the motion to recuse.

We are unable to reach the merits of this point because T.R. waived it. To preserve a claim of judicial bias for review, the appellant must have made a timely motion to the trial court to recuse. *Ashley v. Ashley*, 2012 Ark. App. 230, at 3–4. Without such motion, the disqualification of a judge may be waived. *Id.* at 4. Moreover, a judge's allegedly biased or harsh remarks are not subject to appellate review if the appellant failed to object to those statements or move for the judge's recusal. *Id.* Here, the record shows that T.R. did not object to the alleged bias until he made his oral motion for recusal several months after the adoption hearing and the entry of the adoption decrees. Therefore, we hold that T.R. waived his right to seek recusal. *Id.* (citing *Powhatan Cemetery, Inc. v. Colbert*, 104 Ark. App. 290, 292 S.W.3d 302 (2009) (holding that the trial court did not abuse its discretion in refusing to recuse where the recusal was not sought until after an adverse decision was rendered)).

T.R.'s final point on appeal is that the trial court's findings should be reversed due to ineffective assistance of his trial counsel. He acknowledges that ineffective-assistance-of-counsel claims are generally reserved for criminal defendants whose liberty interests are at stake. However, he requests that the principle be applied in his case where his fundamental right to parent his child is at stake. His examples of ineffective assistance of counsel include his counsel's failure to preserve his constitutional claims and to file a bench brief.

We decline to reach the merits of T.R.'s ineffective-assistance claim because the record does not reflect that this argument was raised below or that the trial court ever made any ruling on the matter. It is well settled that this court will not consider a claim of ineffective assistance of counsel as a point on appeal unless the issue was first raised in the trial court and the facts and circumstances surrounding the claim were fully developed in the trial court. *Jones v. Ark. Dep't Human Servs.*, 361 Ark. 164, 191, 205 S.W.3d 778, 794 (2005) (after holding that parents had a right to effective counsel in termination cases, the court held such a claim must be raised and fully developed in the trial court in order to preserve it for appeal). Accordingly, we hold that T.R.'s ineffective-assistance-of-counsel claim is not preserved.

Affirmed.

HOOFMAN, J., agrees.

VIRDEN, J., concurs.

**BART F. VIRDEN, Judge, concurring.** I respectfully disagree with the majority in holding that T.R.'s consent to the adoption was not required under these circumstances. As a preliminary matter, the concurrences in *Escobedo v. Nickita*, 365 Ark. 548, 231 S.W.3d 601 (2006), are not binding precedent, and I disagree with any suggestion that T.R. had a duty to continually seek out L.H. after having unprotected sex to discover whether a pregnancy resulted from the encounter. Here, L.H. admitted that she did not want T.R. to discover that she was pregnant with his child and that she had changed her telephone number when he attempted to call her. T.R. contacted mutual friends and acquaintances to inquire about L.H., but they ignored his messages, and T.R. testified that L.H. eventually blocked him from viewing her Facebook page. I think these actions demonstrate that L.H. thwarted T.R.'s

efforts to contact her and thus establish a relationship with his child. As soon as T.R. learned of L.H.'s pregnancy, he registered with the Arkansas Putative Father Registry and filed a petition to establish paternity on November 13, 2013. The prospective adoptive parents filed their petition for adoption on December 11, 2013. In other words, T.R. had only one month to form "a significant custodial, personal, or financial relationship" with the baby, who was not even born until December 30, 2013, and was immediately taken away to the home of P.M. and S.M. L.H.'s efforts to conceal her pregnancy prevented T.R. from determining at an earlier date that she was pregnant, which in turn delayed the time within which he had to develop any kind of relationship with his child. It would be unfair to say that T.R.'s consent was not required given the short amount of time he had to establish the requisite relationship with his child.

With that said, I nevertheless agree with the majority's alternative holding that T.R. unreasonably withheld his consent to the adoption, which was contrary to the best interest of the child. As pointed out in the majority opinion, the trial court is required to look at the entire picture of how one has discharged his obligations as a parent. *In re K.M.C.*, 62 Ark. App. 95, 969 S.W.2d 197 (1998). T.R. provided no stability for C.R., who often slept in other people's homes, sometimes slept on the floor, and slept in T.R.'s girlfriends' homes in violation of a cohabitation clause in the custody agreement with C.R.'s mother. T.R. had not even seen E.R. in a couple of years and had taken no steps to gain custody of E.R. even though he suspected that his son was exposed to drug dealers in his mother's custody. T.R. was behind on paying child support for both C.R. and E.R. and had chosen to change jobs with the knowledge that he would be taking a significant pay cut by doing so. T.R. had three

17



children out of wedlock with three women, which suggests a pattern of irresponsible conduct. A parent's past conduct often provides a good indication of what the future may hold. *Stephens v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 249, 427 S.W.3d 160. Therefore, I agree that T.R. unreasonably withheld his consent to the adoption.

*Mostyn Prettyman, PLLC*, by: *J. Benjamin Crabtree*, for appellant.

*Deacon Law Firm*, by: *J. Barrett Deacon*, for appellees P.M. and S.M.

*Christine Horwart*, for appellee L.H.