Cite as 2020 Ark. App. 517

# ARKANSAS COURT OF APPEALS
DIVISION III
No. CV-20-118

| | |
|---|---|
| TIMOTHY LEE NOBLE AND AMANDA DEANN NOBLE<br><br>APPELLANTS<br><br>V.<br><br>JEREMY MAYES, AS NEXT OF FRIEND TO MM<br><br>APPELLEE | **Opinion Delivered:** November 18, 2020<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. 72PR-19-179]<br><br>HONORABLE BETH BRYAN, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Chief Judge

Appellants Timothy Lee Noble and Amanda Deann Noble appeal a decision of the Washington County Circuit Court denying their petition to adopt AMN finding that consent of the putative father was required. On appeal, the Nobles argue (1) that the putative father's consent was not required because he did not meet the mandatory requirements of Arkansas Code Annotated section 9-9-206 (Repl. 2015) and (2) that the putative father was not thwarted in his efforts to comply with the mandatory requirements of the statute. We affirm.

RG, the natural mother of AMN, and MM, the putative father of AMN, had known each other since the beginning of tenth grade and had been best friends for six months before they began to date in February 2018. In late June 2018, RG, accompanied by her mother, went to the hospital to get on birth control at which time a pregnancy test revealed that RG was pregnant. RG called MM immediately after the appointment to tell him she

was pregnant. RG was about four weeks into the pregnancy at that point. MM and RG were both sixteen years old.

Shortly thereafter, MM brought up the possibility of abortion, which was rejected by RG. Adoption was also discussed. In October 2018, MM, RG, and RG's mother met with an adoption agency. The meeting took place at RG's home. At this point in time, MM had not told his parents about the pregnancy at the request of RG and her family. After the meeting, MM became firm in his decision to keep the baby and told his parents about the pregnancy. Upon advice from an attorney, MM filed with the putative father registry on November 2, 2018, and a letter was issued November 20. MM and RG continued to be in a relationship through Christmas 2018, at which point almost all communication ceased both in person and by phone.

On March 5, 2019, prior to the birth of the child on March 6, the Nobles filed a petition for adoption and appointment of attorney ad litem for RG. They alleged in part that (1) the biological mother had expressed a desire to execute a prebirth relinquishment and termination with power to consent to adoption; (2) paternity had not been established by a court; and (3) the putative father had not been married to the biological mother, had not provided support, and had not taken steps to establish paternity. An attorney ad litem was appointed for RG on March 5. The Nobles filed RG's relinquishment of parental rights and consent to guardianship and adoption on March 7. Abba Adoption Services was appointed temporary guardian of the child on March 8. On March 12, counsel entered an appearance on behalf of MM and filed a response to the petition for adoption alleging, in part, that he is the putative father, that he had registered with the putative father registry,

2

and that he had worked to establish a relationship with the child both during the pregnancy and since the child's birth. On March 12, counsel for MM filed a petition to consolidate the adoption case (case No. 72-PR-19-179) with his case to establish paternity filed March 8 (case No. 72-PR-19-406).[1]

On August 27, Jeremy Mayes, MM's father, filed motions to intervene as next friend of MM and to be substituted as next friend of MM, which were granted on September 5. A hearing on the adoption petition took place on October 22 at which MM, RG, and Jeremy testified. Although RG's and MM's testimony regarding their relationship prior to learning of the pregnancy was basically the same, their testimony of the relationship between learning of the pregnancy in June 2018 and Christmas was in dispute.

MM was the first witness called by the Nobles. At the time of the hearing, MM was seventeen years old and a senior in high school; he worked at his father's sawmill. He testified that he initially brought up abortion, which RG rejected. He testified that he and RG began to talk about adoption, which he thought was brought up by RG's parents. MM said RG had always "stuck" to adoption as the plan. He acknowledged that he considered adoption when it was first brought up but said he was "very scared" at that point. He testified that he, RG, and her mother met with a representative of an adoption agency at RG's home on October 16. During the hour-and-a-half meeting, they discussed whether adoption would be a good option. The representative also showed them photos and profiles of

[1]According to a motion to intervene, an order establishing paternity was entered on August 23, 2019, in case No. 72-PR-19-406. The record does not contain an order granting or denying the motion to consolidate.

prospective parents, including the Nobles, and they talked about which ones they liked best. MM stated that he never expressed which family he preferred because he leaned towards keeping the baby.

In regard to their relationship, MM said that they communicated by Instagram, Snapchat, and phone calls and saw each other two to three times a week. RG did not return to school at the end of the summer. He said their relationship remained romantic. He indicated there was friction between them over the plans for the baby, and several times during the pregnancy they did not communicate because RG "blocked" him. MM said he and RG continued to date until Christmas at which time they broke up because of her adoption plan. He was not aware of whether RG had medical insurance or of the care she received. MM admitted that neither he nor his family paid RG's medical bills but said that he and his father told RG they would pay her expenses if she backed out of the adoption plan. He never made a plan to pay RG's expenses or reimburse her for them, although he stated he began saving money to pay for them since the birth of the child.

MM said that his family met with an attorney who told them that he had no rights because he was not married to the mother, but he registered with the putative father registry. He admitted that in his deposition, he stated that he was told to register with the putative father registry in order to stop the adoption.

On cross-examination, MM explained that he did not tell his parents about the pregnancy for four months because RG and her family "begged" him not to tell his parents or anyone else. MM explained that they broke up a month and a half after learning of the pregnancy because they fought "all the time" about what to do but got back together until

4

Christmas. He said they saw each other three to five times a week, elaborating that he would take her out, buy her things when she would let him, and try to surprise her. They discussed what the baby would look like, including eye and hair color, and who she would look like. He indicated RG would sometimes talk about staying together and raising the baby, but they never talked about marrying. He said they came up with two names but chose Logan because it would work for a boy or a girl. He learned the baby was a girl the day RG had an ultrasound and showed him the photo. MM said that he spoke to RG's stomach, kissed her stomach, and tried to feel her stomach each time the baby kicked.

In regard to the adoption-agency meeting, he said he was not asked his opinion about adoption, whether he had any problems with adoption, or whether he would sign a consent to adoption. Although he was at the meeting, he did not feel like he was involved in the discussion. By mid-October, he knew that RG was firm on her adoption decision, and RG knew he was firm on not agreeing to adoption; he felt he was given no choice. MM told his parents a week after the meeting. MM testified that he did not reach out to the adoption agency because he thought the "putative father thing would stop all of it."

MM testified that he asked to go to doctor's appointments but was never allowed to go. He discussed being present at the birth to help RG, to hold her hand, and to be there for the baby when she was born. He was not told when the baby was going to be born but found out at school on the day of her birth and then rushed to the hospital. He was allowed to go into the delivery room after the baby was born and to hold her. At some point, he discussed with RG that they were the only two that could raise the baby and love her. He told her that if she did not want the baby to let him have the baby, which she refused.

MM testified that the relationship ended at Christmas. They had no communication after RG blocked him, and he was not able to go to her house anymore. He stated that during the pregnancy when he and RG were together, he frequently bought her food as well as two stuffed animals. He said they went shopping for baby clothes and items at Walmart and Target on several occasions.

On redirect, MM admitted that RG lived in the same house the entire time and had not moved. He also said that RG expressed that she wanted the baby to have a better life—not two "kids" raising a child together. MM said that RG would sometimes say she was scared or that she wanted to keep the baby but indicated that her parents wanted her to give the baby up for adoption.

RG testified that she and MM remained together during the pregnancy but said there were times she blocked him because she "couldn't take the things he said" to her. She indicated that she "cut off" communication with MM but always left one way "open" in case they needed to get in touch with each other. RG said that MM suggested abortion, which she rejected, and then suggested adoption. She questioned adoption at first because she was confused but then thought it was the best option for the baby.

RG stated that she first met with the adoption agency on August 2, after which she was committed to adoption. She said that MM was aware of the meeting, and she kept him informed until she stopped seeing him about two months into the pregnancy. RG said that at one point, MM agreed with the adoption plan but later informed her he did not agree. Although they discussed raising the child before the October meeting with the adoption agency, RG told MM it would be better for the Nobles to raise her rather than sixteen- and

seventeen-year-old kids. RG said MM agreed with that logic. RG testified that during the October meeting with the adoption agency, they looked at profiles and completed social- and medical-background paperwork.

RG testified that she did not receive financial support from the agency but that the agency had her medical bills. She did not recall that MM offered to pay her bills if she backed out of her adoption plan. RG said that neither MM nor his family provided any financial support.

On cross-examination, RG said that MM told her he wanted to keep the baby the day before he told his parents, and thereafter, he communicated his desire "aggressively." She acknowledged that she told him to "back off" in November 2018 but denied ever telling him never to talk to her again. She indicated that they did not continue to go to basketball or football games in the fall of 2018. She said she and MM stopped having sexual relations after finding out she was pregnant. RG admitted that MM asked if he could go to doctor's appointments and that she told him no. She also admitted that MM told her he wanted to be there for the birth, and she told him she did not want him in the room but that he could be there afterwards to see and hold the baby. She did not tell MM she had gone into labor but acknowledged he was there and held the baby after she was born.

RG stated that MM asked how she was feeling during the pregnancy, and they discussed her having morning sickness. She also acknowledged that when MM would ask how her day was, if she needed anything, or to hang out, that it was MM trying to be there for her, but she denied that he was involved in, or wanted to help her during, the pregnancy. RG also denied looking at baby items at Walmart. RG testified that she never saw MM in

7

the three months before the baby was born but admitted she blocked him from communications. Although she did not invite him over, she said MM was allowed to come to her parents' house. RG said she always kept one line of communication open. On redirect, RG explained that she did not call MM to tell him she was in labor because she had lost her phone.

Following RG's testimony, appellee moved to dismiss on the basis that the Nobles failed to prove by clear and convincing evidence that MM did not establish the relationship. Appellee further argued that the testimony was uncontroverted that MM participated in the baby's life. In denying the motion, the circuit court stated that the testimony was controverted regarding their relationship after learning of the pregnancy.

Jeremy Mayes testified in opposition to the adoption petition and on behalf of his son, MM. He was heavily involved with helping MM since he learned of the pregnancy in October 2018 when RG was five months' pregnant. He stated that from October until December, MM and RG were still in a relationship, and he saw them together at the park or at MM's mother's house. He believed that MM and RG's relationship changed in December, explaining that they went from seeing each other every day, including sneaking around to do so, to things calming down. Jeremy said that RG made it clear to MM that "you're either on my side or – or I just don't want nothing to do with you." Jeremy said that RG's assertion that the relationship ended three months into the pregnancy is "absolutely not true" because RG had been with his family several times in the fall. He said that RG was at his house regularly until Thanksgiving. Jeremy testified that he and RG's father found out about the pregnancy within a few days of each other.

8

Regarding the conversation Jeremy had with RG's family, he stated that he went to their house and talked with them for two hours. Jeremy testified that he offered to take complete financial responsibility for the birth of the child and anything RG needed during the pregnancy; he said he "begged" and "pleaded" with them to allow him to do that but they absolutely would not let him. Jeremy had conversations with MM about keeping the child, and MM was sure it was what he wanted to do. As a result, Jeremy testified that he had noticed MM change from a teenage boy to a young man. MM helped Jeremy every night until 10:00 p.m. to remodel their house in order for MM to provide a better home for him and his daughter. He told MM that he would fully support him in raising the baby.

MM testified again for the defense. He maintained his earlier testimony that they remained in a consistent romantic relationship until December indicating they were together all the time. He stated that they went to football and basketball games together in the fall of 2018. MM acknowledged hiding their relationship at a point because they were supposedly broken up, and he said they were not allowed to see each other after Christmas. In regard to looking at baby items, MM stated that RG was not being truthful in denying having done so. He elaborated about a trip to Target where they stopped to look at baby clothes and a special trip to Walmart in Fayetteville specifically to look at baby items because he wanted to do something nice for RG. When asked about RG's testimony that she blocked him from communication early on, MM explained that they would get in a fight and she would block him for a day or two. On cross-examination, MM stated that he and his dad have been working on their house since the birth of the child in anticipation of needing the house for the child.

After an extensive oral ruling that relied heavily on credibility findings in favor of MM and his father, the fact that the birth parents were minors, and that the petition for adoption was filed a day before the birth of the child, the court denied appellants' petition. The written order on November 6 found in part:

2. The Court further finds that the Petitioners herein filed their Petition without the consent of the putative father and Respondent, [MM], and contend that said consent is not required pursuant to Arkansas Code Annotated § 9-9-206(a)(2)(f), more specifically, that the Respondent and putative father failed to establish a significant custodial, personal or financial relationship with the minor child prior to the Petition for Adoption being filed; that the Respondent, [MM], claims in his Response that his consent is required; that this Court finds that Arkansas law is clear that the Petitioners wishing to adopt the child, must prove that consent is unnecessary by clear and convincing evidence; the Court finds after carefully listening to testimony and observing the witnesses, that the Petitioners have failed to prove by clear and convincing evidence that the putative father and Respondent's consent is not required.

3. The Court further finds that the putative father and Respondent, [MM], has proven that he established a significant custodial, personal or financial relationship with the child before the Petition for Adoption was filed, more specifically, the Court finds that the Respondent was in a relationship with the biological mother, [RG], from February 2018 until the end of December, 2018, which included six (6) months of the pregnancy at issue; during said time, the Respondent and putative father took steps to form a significant custodial, personal or financial relationship with the minor child and that the natural mother, [RG], further thwarted his efforts to continue to establish such relationship to an extent of [sic] sufficient to require the Respondent's consent to the adoption pursuant to Arkansas Code Annotated § 9-9-206(a)(2)(f).

A timely notice of appeal followed.

We review issues of statutory construction de novo, as it is for this court to decide what a statute means. *DaimlerChrysler Corp. v. Smelser*, 375 Ark. 216, 289 S.W.3d 466 (2008). We are not bound by the circuit court's decision; however, in the absence of a showing that the circuit court erred, its interpretation will be accepted as correct on appeal. *Id.* However, when it is the circuit court's application of a statute to the facts before it, our

standard of review is clearly erroneous. *Racine v. Nelson*, 2011 Ark. 50, 378 S.W.3d 93. A

finding is clearly erroneous when, despite evidence to support it, we are left on the evidence

with the firm conviction that a mistake has been committed. *Morningstar v. Bush*, 2011 Ark.

350, 383 S.W.3d 840.

Adoption proceedings are reviewed de novo. *In re A.R.*, 103 Ark. App. 1, 3, 285

S.W.3d 716, 717 (2008). Adoption statutes are strictly construed, and a person who wishes

to adopt a child without the consent of the parent must prove that consent is unnecessary

by clear and convincing evidence. *In re Adoption of Lybrand*, 329 Ark. 163, 169–70, 946

S.W.2d 946, 949–50 (1997) (citing *In re Adoption of K.F.H. and K.F.H.*, 311 Ark. 416, 844

S.W.2d 343 (1993); *Harper v. Caskin*, 265 Ark. 558, 561, 580 S.W.2d 176, 179 (1979)

(stating adoption petitioner's burden is "heavy")). A finding regarding consent will not be

reversed unless clearly erroneous. *Id.*; *see also Racine*, *supra*. We defer to the circuit court in

making credibility determinations because the circuit court is in a better position to judge

the credibility of witnesses. *In re A.R.*, 103 Ark. App. at 4, 285 S.W.3d at 718.

In *In re Adoption of Glover*, 288 Ark. 59, 62–63, 702 S.W.2d 12, 13–14 (1986), our

supreme court stated:

> The court gives careful protection to a natural parent's rights. As announced
> in *Woodson v. Lee*, 221 Ark. 517, 254 S.W.2d 326 (1953), quoting *In re Cordy*, 169
> Cal. 150, 157, 146 P.2d 532 (1914),
>
>> . . . the power of the court in adoption proceedings to deprive a parent of her
>> child, being in derogation of her natural right to it, and being a special power
>> conferred by the statute, such statute should be strictly construed; that 'the
>> law is solicitous toward maintaining the integrity of the natural relation of
>> parent and child; and in adversary proceedings in adoption, where the absolute
>> severance of that relation is sought, without the consent and against the protest
>> of the parent, the inclination of the courts, as the law contemplates it should
>> be, is in favor of maintaining the natural relation. . . . Every intendment should

have been in favor of the claim of the mother under the evidence, and if the statute was open to construction and interpretation it should be construed in support of the right of the natural parent.'

For their first point on appeal, the Nobles argue that the circuit court erred in finding that MM's consent to adoption was required. They state that the circuit court's decision was based on a misinterpretation of Arkansas Code Annotated section 9-9-206(a)(2)(F). Specifically, they argue that the circuit court erred by not requiring strict compliance by MM with the statute that governs the consent of the putative father.

Arkansas Code Annotated section 9-9-206(a)(2) provides that unless consent is not required under section 9-9-207, a petition to adopt a minor may be granted only if written consent to a particular adoption has been executed by:

(2) The father of the minor if:

(A) The father was married to the mother at the time the minor was conceived or at any time thereafter;

(B) The minor is his child by adoption;

(C) He has physical custody of the minor at the time the petition is filed;

(D) He has a written order granting him legal custody of the minor at the time the petition for adoption is filed;

(E) A court has adjudicated him to be the legal father prior to the time the petition for adoption is filed;

(F) He proves a significant custodial, personal, or financial relationship existed with the minor before the petition for adoption is filed; or

(G) He has acknowledged paternity under § 9-10-120(a)[.]

The circuit court's decision was made under subsection (a)(2)(F)—that he proved a significant custodial, personal, or financial relationship existed with the minor. This language

12

was added in the 2005 amendment to the statute. The language "custodial, personal or financial relationship" came from the decision in *Lehr v. Robinson*, 463 U.S. 248 (1983), which involved the issue of "whether New York has sufficiently protected an unmarried father's inchoate relationship with a child whom he has never supported and rarely seen in the two years since her birth." *Lehr*, 463 U.S. at 249–50. In discussing the biological link of the natural father, the Court explained:

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

*Id*. at 262 (footnote omitted). The Court wrote that the appellant "never had any significant custodial, personal, or financial relationship with [the child], and he did not seek to establish a legal tie until after she was two years old." *Id*. at 262–63. The Court was "concerned only with whether New York has adequately protected his opportunity to form such a relationship." *Id*. The Court stated that appellant's right to receive notice of the adoption proceedings was completely within his control as he could have mailed a postcard to the putative father registry. *Id*. at 264. Ultimately, the Court concluded that appellant's constitutional rights were not violated because the New York statutes adequately protected his inchoate interest in establishing a relationship with his child. *Id*. at 265.

The Nobles contend that MM never had custody of the child, never paid any expenses for the mother or the child, and never paid any of the child's medical bills. They acknowledge that MM made one offer to pay for the hospital bills if the adoption did not

13

continue, which was rejected. The Nobles suggest that these uncontested facts were clear and convincing evidence that the putative father's consent was not required.

The Nobles also suggest that under the current state of the law, it is unclear how much of a custodial, personal, or financial relationship is required by the statute, questioning the meaning of what constitutes a "significant custodial, personal, or financial" relationship. They argue that the circuit court's decision set the bar so low that the "feeble actions such as those by MM may require the consent of a putative father." They suggest that MM's only connection to the child is RG and that MM did little more than file with the putative father registry and offer conditional financial assistance; thus, MM failed to establish any of the required relationships with the minor prior to the petition for adoption, and therefore his consent was not required. The Nobles state that our caselaw does not address the issue before us and direct us to other states' interpretations of the rights and duties of putative fathers as persuasive authority. However, we are not persuaded by these authorities because their consent requirements differ from the Arkansas statute.

The circuit court orally stated that its findings of fact and conclusions of law relied "in no small measure" on its ability to personally observe the witnesses as they testified; ultimately, the circuit court found MM's and Jeremy's testimony credible as to the time MM and RG spent together from February 2018 through December. There was evidence that MM made repeated statements to RG that he did not want to give the child up for adoption; MM asked RG to let him raise the baby; MM asked to be present at the birth to hold RG's hand though the process and be there to hold the baby immediately after she was born; MM wanted to attend RG's doctor's appointments; MM told RG he wanted to be

14

there for her, recognized she was scared, and assured her that they could get through it together; MM referred to the child by the name which they had given her, including talking to RG's stomach and telling RG to tell her goodnight while in utero on a regular basis; RG showed MM an ultrasound photo; MM felt the baby kick and would rub and kiss RG's stomach; and they looked at baby clothes together on at least two occasions. The circuit court found Jeremy's testimony credible that he offered to pay for the birthing expenses and begged to take care of the child and accept all financial expenses relating to the child, which was declined by RG's family. In addition to buying meals for RG, the court noted that, while minimal, MM bought two stuffed animals. The circuit court recognized that MM and Jeremy had been adding on to their house, working seven days a week until ten o'clock at night to remodel their home to make room for the baby and that MM had been saving for the baby.

Ultimately, the circuit court found that MM had established the requisite relationship and that the Nobles had failed to prove that MM's consent was not required. In its oral ruling, the court stated that in considering all the facts and circumstances, especially the facts that both birth parents were minors and that the petition for adoption was filed prior to the AMN's birth, the steps taken by MM created a significant personal relationship. The court stated it could "think of nothing else as it relates to the personal relationship that the putative father could have done to establish this significant personal relationship." Because the appellate court gives great deference to a circuit court's findings of fact, *see In re Baby Boy B.*, 2012 Ark. 92, at 8, 394 S.W.3d 837, 841, we cannot say that the circuit court's findings are clearly erroneous.

For their second point on appeal, the Nobles contend that the circuit court's finding that MM's efforts to establish a significant custodial, personal, or financial relationship were thwarted by RG after December is clearly erroneous.

Our supreme court in *In re Adoption of Baby Boy B.* addressed the issue of what degree of compliance is necessary by the father such that his consent to an adoption of his minor child is required. 2012 Ark. 92, at 8, 394 S.W.3d at 841. The supreme court held that the biological father's efforts to establish a significant custodial, personal, or financial relationship, in light of the biological mother's thwarting of his efforts, were sufficient such that his consent to the adoption was required pursuant to section 9-9-206(a)(2). *Id.* at 13, 394 S.W.3d at 844.

The Nobles suggest that MM's efforts are "woefully insufficient" when compared to the efforts of the birth father in *In re Adoption of Baby Boy B.* In that case, the birth parents were college students and were in a relationship for the first five months of the pregnancy until the mother left and would not reveal where she went. The evidence established that (1) the putative father told his friends and family about the pregnancy when he found out; (2) he tried to go to the doctor with the mother, but his schedule did not allow him to go; (3) he and the mother went to a pregnancy center for information; (4) the parents were romantically involved until the mother left; (5) the mother stayed at the putative father's apartment several nights a week; (6) he indicated the mother did not have morning sickness but rubbed the mother's stomach and back to comfort her as she was stressed; (6) he purchased a Valentine's gift for the mother, which consisted of a massage and a diaper/school bag; (7) he expressed concern for the unborn child; (8) he suggested a name for the baby;

(9) he told the mother he would always be there for her; (10) he tried to find where the mother was located after she left and learned she was in Texas from the adoption agency through which she was working; (11) he filed with the putative father registry in four states and filed paternity and custody actions in two states; (12) he did not provide financial support although he was employed during the pregnancy; and (13) his mother loaned him $1100 to place in an account for the benefit of the child. *Id.* at 11–12, 394 S.W.3d at 843–44.

Although the circuit court found that the father had done all he could do to protect his rights under the circumstances, it relied on a case from our court that held that strict compliance with the statute was required and found that his consent was not required.[2] Our supreme court reversed, holding that appellant had taken steps to form a significant custodial, personal, or financial relationship with the child. *Id.* at 13, 394 S.W.3d at 844. Although the appellants argued that the father could have done more, the court stated that "the question is whether appellant's efforts to establish a significant custodial, personal, or financial relationship, in light of [the mother's] thwarting of his efforts, were sufficient such that his consent to the adoption was required pursuant to section 9-9-206(a)(2). The court concluded that they were and held that the circuit court's decision was clearly erroneous, reversing the circuit court's decision that the father's consent was not required. *Id.* at 13, 394 S.W.3d at 844.

---

[2]*See X.T. v. M.M.*, 2010 Ark. App. 556, 377 S.W.3d 442, *overruled by In re Adoption of Baby Boy B.*, 2012 Ark. 92, 394 S.W.3d 837.

Appellants contend that the facts presented here are more aligned with *T.R. v. L.H.*, 2015 Ark. App. 483, than *Baby Boy B.* We disagree. In *T.R.*, the birth parents had a romantic relationship in March and April 2013, which ended on April 27. Shortly thereafter, the mother learned she was pregnant and did not notify the father and decided to place the baby for adoption because she was divorced with two young children. The adoptive parents met the mother in mid-May and began to support the mother financially and emotionally until the child's birth on December 30. The parents had no contact with one another after the relationship ended. On November 11, 2013, the father learned of the pregnancy from a friend of the mother and filed with the putative father registry the next day. He filed a petition to establish paternity and objected to the adoption on November 13. *T.R.*, 2015 Ark. App. 483, at 1. The mother admitted that she did not tell the father she was pregnant but stated that she did nothing to avoid him and that her address and email had not changed. *Id.* at 2. The circuit court held that appellant's consent was not required and specifically found that the father was not a credible witness. *Id.*

On appeal, the father argued that in the short amount of time he was given—the time between when he learned of the pregnancy and the filing of the adoption petition—he established the requisite relationship with the child, and thus his consent was required, which this court rejected. In affirming, this court noted that other than changing her phone number seven months after they broke up and blocking him from Facebook, there was no evidence that the mother avoided him as her address she shared with the father and her email remained the same. *Id.* at 5. *T.R.* relied on *In re Baby Boy B.*, which we rejected, stating that T.R. did not establish a significant, custodial, personal, or financial relationship

as did the putative father in *In re Baby Boy B. Id.* at 5. We also stated that the facts did not support his argument that his efforts were thwarted. *Id.* Further, our court concluded that his argument that he did not have enough time to form the requisite relationship lacked merit because T.R. failed to follow up with the mother and inquire about the possibility of a pregnancy once their relationship ended, which he had the burden to do under Arkansas law. *Id.*

Here, the circuit court noted in its oral ruling that it was clear from MM's testimony that after December, RG blocked MM from communication, and he was not welcome at her home. The circuit court emphasized that these parents are minors, and although MM knew where RG lived and had the same phone number, it did not give him the right to show up at her home every day. The court stated that RG's family made it clear MM was not welcome there and found that under these circumstances, "there was really nothing more that [MM] could have done to have a significant personal relationship with the child." Considering the facts and circumstances in this case, along with the credibility determinations by the circuit court, we cannot say the circuit court's finding that RG thwarted MM's efforts to establish a significant custodial, personal, or financial relationship after December is clearly erroneous.

Affirmed.

GLADWIN and HARRISON, JJ., agree.

*H. Keith Morrison*, for appellants.

*Gramlin/Estes Law Firm*, by: *Peter (Tripp) G. Estes III*, for appellee.

19